IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF OKLAHOMA

EMMANUEL LITTLEJOHN,     )
          )
    Petitioner,     )
          )
vs.          )     Case No. CIV-05-225-M
          )
RANDALL G. WORKMAN, Warden,     )
    Oklahoma State Penitentiary,     )
          )
    Respondent.[1]     )

## MEMORANDUM OPINION

Petitioner, Emmanuel Littlejohn, a state court prisoner, has filed a Petition for Writ of Habeas Corpus seeking relief pursuant to 28 U.S.C. § 2254. Doc. 13. Petitioner, who is represented by counsel, is challenging the convictions entered against him in Oklahoma County District Court Case No. CF-92-3633. In that case, Petitioner was found guilty by jury of Robbery with a Firearm, After Former Conviction of Two or More Felonies (Count I), First Degree Malice Aforethought Murder (Count II), and Conspiracy to Commit Robbery with a Firearm, After Former Conviction of Two or More Felonies (Count III). Petitioner

---

[1] When this action was commenced, Mike Mullin was the warden of the Oklahoma State Penitentiary and the properly named Respondent. However, Randall G. Workman is the current warden of the Oklahoma State Penitentiary and the state officer having present custody of Petitioner. Thus, pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, the Court finds that Mr. Workman should be substituted for Mr. Mullin as the proper party Respondent. See Rule 2(a) of the Rules Governing Section 2254 Cases in the United States District Courts ("If the petitioner is currently in custody under a state-court judgment, the petition must name as respondent the state officer who has custody.").

received a 300-year sentence on Count I and 99-year sentence on Count III. Petitioner received a sentence of death for his murder conviction.

Petitioner has presented 14 grounds for relief. Doc. 13. Respondent has responded to the Petition and Petitioner has replied. Docs. 25 and 26. In addition to his Petition, Petitioner also filed motions for discovery and an evidentiary hearing. Docs. 16 and 21. These motions have been denied. Docs. 30 and 31. The state court record has been provided.[2] Doc. 24. After a thorough review of the entire state court record, the pleadings filed herein, and the applicable law, the Court finds that, for the reasons set forth below, Petitioner is not entitled to his requested relief.

## I. Procedural History.

Petitioner's original trial was held in November 1994. The jury found Petitioner guilty of all three counts and set punishment at 300 years, death, and 99 years, respectively. In Case No. F-94-1269, Petitioner appealed his convictions and sentences to the Oklahoma Court of Criminal Appeals (hereinafter "OCCA"). While the appeal was pending, the United States Supreme Court decided Cooper v. Oklahoma, 517 U.S. 348 (1996). In light of Cooper, the OCCA ordered the state trial court, if feasible, to conduct a retrospective competency hearing utilizing the preponderance of the evidence standard. A jury trial on the

---

[2] Reference herein to the state court record will be as follows: original record (O.R.); original competency hearing held May 2-4, 1994 (O.C. Trial Tr.); original trial held November 7-18, 1994 (1994 Trial Tr.); retrospective competency hearing held October 20-23, 1997 (R.C. Trial Tr.); resentencing trial held October 30, 2000, through November 8, 2000 (2000 Trial Tr.); and Glenn Bethany trial transcript (Bethany Tr.).

issue of competency was held in October 1997. The jury found that Petitioner was competent to stand trial in 1994.

In a published opinion, Littlejohn v. State, 989 P.2d 901 (Okla. Crim. App. 1998) (hereinafter "Littlejohn I"), the OCCA granted Petitioner partial relief. Finding no reversible error in the guilt stage, the OCCA affirmed Petitioner's convictions. The OCCA also upheld Petitioner's sentences on Counts I and III. However, the OCCA did find error in the imposition of Petitioner's death sentence. Accordingly, Petitioner's death sentence was vacated and the matter was remanded to the state trial court for resentencing. Littlejohn, 989 P.2d at 912.

Petitioner's resentencing trial began October 30, 2000. Again, Petitioner received a sentence of death. In support of his sentence, the jury found two aggravating circumstances: (1) Petitioner was previously convicted of a felony involving the use or threat of violence to the person; and (2) the existence of a probability that Petitioner would commit criminal acts of violence that would constitute a continuing threat to society. In Case No. D-2000-1609, Petitioner appealed his death sentence to the OCCA. In a published opinion, Littlejohn v. State, 85 P.3d 287 (Okla. Crim. App. 2004) (hereinafter "Littlejohn II"), the OCCA denied relief. Petitioner sought rehearing, and although the OCCA granted rehearing, it did so only to clarify its decision. It did not grant Petitioner his requested relief. See Order Granting Rehearing Denying Relief and Directing Issuance of Mandate, Case No. D-2000-1609 (Mar. 23, 2004). Petitioner sought review of the OCCA's decision by the United States

Supreme Court. His petition for writ of certiorari was denied on October 18, 2004. Littlejohn v. Oklahoma, 543 U.S. 947 (2004).

In Case No. PCD-2002-551, Petitioner sought post-conviction relief from the OCCA.[3] Petitioner also requested an evidentiary hearing on his claims. In an unpublished opinion, the OCCA denied Petitioner an evidentiary hearing and his requested relief. Littlejohn v. State, No. PCD-2002-551 (Okla. Crim. App. May 4, 2004) (unpublished). After the present action was filed, Petitioner attempted to return to state court to file a second post-conviction application. No application was ever filed and the OCCA dismissed the action. Littlejohn v. State, No. PCD-2005-1155 (Okla. Crim. App. Dec. 28, 2005) (unpublished).

## II. Facts.

The basic facts are simple and undisputed. On June 19, 1992, Petitioner and Glenn Bethany robbed an Oklahoma City convenience store. An employee, Kenneth Meers, was shot and killed as Petitioner and Bethany exited the store. Littlejohn I, 989 P.2d at 904. While Petitioner has admitted that he conspired to, and did in fact commit, the robbery, he has denied that he fired the single shot that killed Mr. Meers. Additional facts will be referenced herein as they relate to the individual grounds for relief raised by Petitioner.

---

[3] Technically, this was Petitioner's second application for post-conviction relief. Petitioner's initial post-conviction application was dismissed upon the granting of relief in Littlejohn I. In its order of dismissal in Case No. PC-97-605, the OCCA acknowledged that Petitioner would not be prejudiced by the dismissal. The OCCA held that after resentencing "[Petitioner] may raise all post-conviction issues allowed under the Post-Conviction Procedure Act, including issues resulting from the guilt-innocence, or conviction, phase of trial as well as those raised in the resentencing hearing" (O.R. VIII, 1515-16) (footnote omitted).

### III. Standard of Review.

#### A. Exhaustion as a Preliminary Consideration.

The exhaustion doctrine is a matter of comity. It provides that before a federal court can seek to grant habeas relief to a state prisoner, it must first determine that he has exhausted all of his state court remedies. As acknowledged in Coleman v. Thompson, 501 U.S. 722, 731 (1991), "in a federal system, the States should have the first opportunity to address and correct alleged violations of state prisoner's federal rights." While the exhaustion doctrine has long been a part of habeas jurisprudence, it is now codified in 28 U.S.C. § 2254(b). Pursuant to 28 U.S.C. § 2254(b)(2), "[a]n application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."

#### B. Procedural Bar.

Beyond the issue of exhaustion, a federal habeas court must also examine the state court's resolution of the presented claim. "It is well established that federal courts will not review questions of federal law presented in a habeas petition when the state court's decision rests upon a state-law ground that 'is independent of the federal question and adequate to support the judgment.'" Cone v. Bell, 129 S.Ct. 1769, 1780 (2009) (quoting Coleman). "The doctrine applies to bar federal habeas when a state court declined to address a prisoner's federal claims because the prisoner had failed to meet a state procedural requirement." Coleman, 501 U.S. at 729-30.

## C.    Merits.

In accordance with 28 U.S.C. § 2254(d), this Court's ability to grant habeas corpus relief to state prisoners is limited.  When a state prisoner presents a claim to this Court, the merits of which have been addressed in state court proceedings, this Court cannot grant habeas corpus relief upon the claim unless it determines that the state court proceedings resulted in a decision (1) "that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or (2) "that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).  As the Supreme Court acknowledged in Schiro v. Landrigan, 550 U.S. 465, 473 (2007), "[t]he question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable - a substantially higher threshold."

The Supreme Court discussed the "contrary to or unreasonable application of" standard in Williams v. Taylor, 529 U.S. 362 (2000).  The Court held as follows:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

Williams, 529 U.S. at 412-13 (O'Connor, J., concurring but delivering the opinion of the Court with respect to Part II).  Thus, to be contrary to, "[i]t is not enough that the state court

decided an issue contrary to a lower federal court's conception of how the rule should be applied; the state court decision must be 'diametrically different' and 'mutually opposed' to the Supreme Court decision itself." Gonzales v. Tafoya, 515 F.3d 1097, 1109 (10th Cir. 2008) (quoting Williams). In addition, and with respect to the unreasonable application clause, "a petitioner is not entitled to relief merely because a federal court concluded in its independent judgment that the state court has applied federal law erroneously or incorrectly. Instead, the state court's application of federal law must be objectively unreasonable." Id. (citations omitted). See also Torres v. Mullin, 317 F.3d 1145, 1150-51, 1156 (10th Cir. 2003) (discussing Williams and concluding that "[a]lthough a state court's reasoning does matter, ultimately, it is the reasonableness of the outcome that is paramount.").

In Maynard v. Boone, 468 F.3d 665, 669-71 (10th Cir. 2006), the Tenth Circuit provided guidance as to what constitutes an unreasonable application. Agreeing that "considerable deference" should be afforded state court decisions, the Court held that "only the most serious misapplications of Supreme Court precedent will be a basis for relief under § 2254." Maynard, 468 F.3d at 671. The Court determined that "a decision is 'objectively unreasonable' when most reasonable jurists exercising their independent judgment would conclude the state court misapplied Supreme Court law." Moreover, "[i]t is not enough that the decision is clearly wrong or that the reviewing court would have reached a contrary decision." Id. Citing the Seventh Circuit, the Court concluded that "the state court decision

must be 'at such tension with governing U.S. Supreme Court precedents, or so inadequately supported by the record, or so arbitrary as to be unreasonable.'" Id. (quoting Badelle v. Correll, 452 F.3d 648, 655 (7th Cir. 2006)).

## IV.  Analysis.

**A.  Ground One:          Inconsistent Prosecutorial Theories.**

In his first ground for relief, Petitioner asserts a due process violation based upon the inconsistent theories advanced by the State at his trial and at the trial of his co-defendant, Glenn Bethany.  Because the State argued in Bethany's trial that Bethany was the shooter, Petitioner's contention is that the State should have been precluded from arguing in his trial that he fired the single shot that killed Mr. Meers.   Petitioner raised this claim in his first direct appeal.[4]   The OCCA denied relief.   Littlejohn I, 989 P.2d at 908-09.  Because the OCCA addressed the claim on the merits, Petitioner is only entitled to relief upon a showing

---

[4] Petitioner asserts that the violation affected both the guilt and punishment stages of his trial. As Respondent has pointed out, however, the claim is unexhausted as to the second stage because Petitioner was granted a new sentencing hearing in Littlejohn I and he did not subsequently raise the claim in Littlejohn II. However, given the lack of merit to the overall claim, the failure to exhaust both aspects of the claim is of no consequence. See 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."). Regarding the second stage, even Petitioner acknowledges that any error was "attenuated somewhat" by the resentencing proceeding. Petition, p. 19. At resentencing, Petitioner was permitted to introduce relevant portions of the prosecutor's closing argument from the Bethany trial and then argue the matter to the jury (2000 Trial Tr. VII, 248-49, 282, 285, 287, 301-02). In addition, the jury was instructed on the following mitigating circumstance: "The defendant was leaving the store or had left the store when Glen [sic] Bethany shot Kenneth Meers" (O.R. X, 1887).  Given these circumstances, which reveal that the matter was well-vetted before the jury, it is even more apparent that Petitioner's claim fails as to the second stage.

that the OCCA's decision is contrary to or an unreasonable application of Supreme Court law. Petitioner has not met this burden.

Petitioner and Bethany were jointly charged in Mr. Meers' death. The information alleged that the murder was committed with malice aforethought, or in the alternative, during the commission of a felony (O.R. I, 46-47). Bethany was tried first and was convicted of felony murder (Bethany Tr. 818). In the closing argument of that trial, the prosecutor asserted that Bethany was undoubtedly guilty of felony murder (Bethany Tr. 741, 746). The prosecutor argued, however, that the shooter was guilty of malice murder (Bethany Tr. 742, 743). Recalling the presented evidence, the prosecutor argued two points which supported a finding that Bethany was the shooter: (1) Bethany could have had a gun, even though no one saw him with it; and (2) witnesses standing across the street from the store testified that the taller man fired the shot and Bethany was the taller man (Bethany Tr. 745-46, 782-83, 785-86, 788, 790-91). Unlike the prosecutor's stance on the issue of felony murder, the prosecutor made no outright assertions that Bethany was the shooter, but repeatedly reminded the jurors that it was their task to determine whether Bethany was guilty of malice murder or felony murder (Bethany Tr. 742, 746-47, 786, 787, 789, 795-98). For example, the prosecutor stated:

> You have to listen to the evidence and determine what happened on June the 19th of 1992, not based on what I think or based on what Mr. Albert [defense counsel] thinks, but based on the evidence that you have heard during this trial, coupled with these legal instructions.

(Bethany Tr. 789). And again,

I'm going to ask you, just as Mr. Albert [defense counsel] has asked you, to carefully scrutinize the evidence and that you not go back there and make a decision because it's the easy way out or because it's the fastest way to do things. I would submit to you that when you go back there that you must carefully scrutinize the testimony of everyone, which includes the testimony of the people across the street, who are certain that it was the taller of the two individuals who stood at the door and fired a shot back inside. And that you consider all of that evidence and then you decide what actually happened, whether he's guilty of Murder by malice aforethought or guilty of felony murder during the commission of a felony. And that's the decision that you all have to make.

(Bethany Tr. 796-97). And also,

They murdered Kenneth Meers. There's no question about that, that they had murdered and taken the life of Kenneth Meers. The question is whether you believe he is the shooter or the other man who was inside the store that day. Either way, he's guilty of murder. The question is which of those two murders is he guilty of, malice or felony.

(Bethany Tr. 797).

At Petitioner's trial, the prosecutor also argued Petitioner was guilty of at least felony murder and that the shooter was guilty of malice murder (1994 Trial Tr. VI, 25, 29, 50). However, the prosecutor went further and adamantly asserted that Petitioner was the actual shooter (1994 Trial Tr. VI, 26, 30-31, 47, 61). The prosecutor argued that Petitioner was the only one who had a gun (1994 Trial Tr. VI, 27, 28, 42, 43, 51-53, 59), and the testimony of the witnesses across the street was discounted (1994 Trial Tr. VI, 43-45). The jury found Petitioner guilty of malice murder.

In denying Petitioner relief on this claim, the OCCA found that the prosecutor's arguments were not inappropriate.

10

Although the prosecutor did argue at Bethany's trial that Bethany could have been the shooter, we find that given the uncertainty of the evidence it was proper for the prosecutor to argue alternate theories as to the facts of the murder. The issue of whether Littlejohn was the actual shooter was an appropriate question for the jury.

Littlejohn I, 989 P.2d at 909 (footnote omitted). As a part of its holding, the OCCA characterized the evidence as follows:

In the instant case, there was no physical evidence demonstrating who fired the fatal shot. Tony Hulsey testified he saw Littlejohn pointing his gun towards the victim just prior to the shot being fired. Yet, Hulsey did not see who fired the shot. Neither Hulsey nor Waldrup ever saw co-defendant Bethany with a firearm. On the other hand, witnesses outside the convenience store believed the shooter was the taller of the two perpetrators. Littlejohn was described as light-skinned and short while Bethany was described as much darker and taller. Thus, the evidence was less than conclusive as to the identity of the shooter.

Id.

With citation to Berger v. United States, 295 U.S. 78 (1935), Brady v. Maryland, 373 U.S. 83 (1963), and Turner v. Louisiana, 379 U.S. 466 (1965), Petitioner asserts that the prosecutor's actions in the present case were unfair, unjust, and foul, resulting in his being denied a fundamentally fair trial. Thus, Petitioner claims that the decision of the OCCA finding nothing inappropriate with the prosecutor's actions is contrary to or an unreasonable application of this Supreme Court authority.[5]

---

[5] Petitioner also makes reference to the Supreme Court's decision in Bradshaw v. Stumpf, 545 U.S. 175 (2005). However, Bradshaw was decided several years after the OCCA's decision in Petitioner's case. It is therefore not "clearly established Federal law" under § 2254(d)(1). Lockyer v. Andrade, 538 U.S. 63, 71-72 (2003).

Berger acknowledges that a prosecutor is the pursuer of justice. "It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one." Berger, 295 U.S. at 88. In Berger, the prosecutor's behavior was "indecorous and improper." The Court summarized his actions as follows:

> He was guilty of misstating the facts in his cross-examination of witnesses; of putting into the mouths of such witnesses things which they had not said; of suggesting by his questions that statements had been made to him personally out of court, in respect of which no proof was offered; of pretending to understand that a witness had said something which he had not said and persistently cross-examining the witness upon that basis; of assuming prejudicial facts not in evidence; [and] of bullying and arguing with witnesses . . . .

Id. at 84.

The prosecutor's actions in the present case do not compare to those dealt with in Berger. While the prosecutor's arguments in the separate trials varied, they were based on the presented evidence. In Bethany's trial, the prosecutor made reference to evidence which might support a finding that Bethany was the shooter. However, the prosecutor did not advocate for malice murder conviction, but repeatedly told the jurors that it was their determination to make. In Petitioner's case, the prosecutor was more adamant that Petitioner was the shooter, but the argument was still premised on the presented evidence. There were no eyewitnesses to the actual shooting. Immediately before the shot, however, Petitioner was pointing a weapon, one consistent with the bullet fragments found at the scene, in Mr. Meers' direction (1994 Trial Tr. IV, 66, 68, 69, 90; 1994 Trial Tr. V, 71-72). Bethany was never

seen with a weapon. As to the witnesses across the street, the one witness, Jerry Watson, readily admitted that he was "drunk off [his] feet" (1994 Trial Tr. IV, 170). In addition, Mr. Watson's testimony was inconsistent with that of his stepson, Alton Snow, on the matter of in which hand the shooter held the gun (1994 Trial Tr. IV, 145, 166).

It is well-established that "[a] prosecutor may comment on and draw reasonable inferences from evidence presented at trial." Thornburg v. Mullin, 422 F.3d 1113, 1131 (10th Cir. 2005). Because the prosecutor's argument in the present case was grounded in the very evidence before the jury, the OCCA's determination that the prosecutor's argument was permissible is not contrary to or an unreasonable application of clearly established federal law.

Beyond the analysis of Petitioner's claim under Berger (and general fundamental fairness Supreme Court jurisprudence), the Court cannot overlook Justice Thomas' concurring opinion in Bradshaw which questions the very viability of Petitioner's claim under the AEDPA. In Bradshaw, Justice Thomas, joined by Justice Scalia, stated that the Supreme Court "has never hinted, much less held, that the Due Process Clause prevents a State from prosecuting defendants based on inconsistent theories." Bradshaw, 545 U.S. at 190 (Thomas, J., concurring). As Supreme Court law is the standard by which the habeas court evaluates a petitioner's entitlement to relief, this statement by Justice Thomas as to the current state of Supreme Court law on the issue of inconsistent prosecutorial theories provides additional support for the Court's finding that Petitioner has failed to show that the

decision of the OCCA is contrary to or an unreasonable application of Supreme Court jurisprudence.  Petitioner's Ground One is denied.

**B.    Ground Two:        Prosecutorial Misconduct in the First Stage.**

In his Ground Two, Petitioner claims that he was denied a fair trial due to certain comments made by the prosecutor in first stage closing arguments.  Petitioner raised this claim on direct appeal.  The OCCA denied relief.  Littlejohn I, 989 P.2d at 910.

Claims regarding improper prosecutorial argument are subjected to due process review.  The question is whether the prosecutor's comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process."  Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974).  As the Supreme Court has acknowledged, "a criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone, for the statements or conduct must be viewed in context; only by so doing can it be determined whether the prosecutor's conduct affected the fairness of the trial."  United States v. Young, 470 U.S. 1, 11 (1985). Thus, a fundamental fairness inquiry "requires examination of the entire proceedings, including the strength of the evidence against the petitioner . . . ."  Le v. Mullin, 311 F.3d 1002, 1013 (10th Cir. 2002).  "Counsel's failure to object to the comments, while not dispositive, is also relevant to a fundamental fairness assessment." Ultimately, the focus is on whether the jury was able "to judge the evidence fairly in light of the prosecutor's conduct." Id.

None of the comments complained of by Petitioner were objected to at trial. Due to the lack of an objection, the OCCA reviewed the comments for plain error only. The OCCA found that no plain error occurred. While the OCCA specifically addressed only one of the comments, it is nevertheless clear that OCCA reviewed the entire claim on the merits. Littlejohn I, 989 P.2d at 910. Under these circumstances, the Court will "review each assertion of improper prosecutorial comments independently under federal law, and . . . afford § 2254(d) deference to the OCCA's ultimate conclusion that a new trial was not warranted on the basis of prosecutorial misconduct." Douglas v. Workman, 560 F.3d 1156, 1179 (10th Cir. 2009).

Petitioner's first complaint concerns two comments made by the prosecutor regarding the speaker of the words "get down." As Mr. Meers came from the back of the store, someone said "get down." One store employee, Tony Hulsey, testified that "someone" said it (1994 Trial Tr. IV, 66). Another store employee, Danny Waldrup, testified that he was not sure who said it, but was "pretty sure" it was Mr. Meers (1994 Trial Tr. IV, 120, 123). Additionally relevant to this complaint is the medical examiner's testimony that the bullet which killed Mr. Meers was traveling at a downward direction (1994 Trial Tr. V, 124).

In first closing argument, the prosecutor stated that "somebody" yelled "get down." The prosecutor then posited whether Mr. Meers "was simply trying to do what he was told and get down" when he was shot in the face (1994 Trial Tr. VI, 27, 30-31). In second closing argument, the prosecutor reiterated the point.

I think the circumstantial evidence and the testimony of the witnesses there tell you what occurred. As Mr. Littlejohn's telling everybody to get down, get down, get down, that Kenneth Meers attempts to do that. Because we know that that shot entered his face this way and came out here. And I would submit to you that's it clear that Mr. Meers at least at some point was attempting to do what he had been told, that is to get down. And that it was at that point that Mr. Littlejohn fired the shot into his face, expecting that Mr. Meers may try to prevent him from escaping.

(1994 Trial Tr. VI, 61).

The OCCA found that this line of argument was overreaching; however, it found no plain error given the overwhelming evidence of Petitioner's guilt. Littlejohn I, 989 P.2d at 910. The Court agrees with the OCCA's determination. Attributing the "get down" statement to Petitioner was a clear stretching of the presented evidence,[6] especially given Mr. Waldrup's testimony that the statement was made by the victim himself. However, while inappropriate, the comments are not of such significance to warrant the granting of relief. As the OCCA found, the evidence of Petitioner's guilt was strong. Petitioner admitted his involvement in the robbery and was therefore guilty of felony murder at a minimum. While there was no conclusive evidence as to who the actual shooter was, there was strong evidence that it was Petitioner. Petitioner was the only one seen with a gun, one which he was pointing at Mr. Meers just seconds before the fatal shot was fired. In addition, the State presented two witnesses who testified that they both heard Petitioner admit that he was the one who shot Mr. Meers (1994 Tr. V, 88, 106-08). For these reasons, the argument of the

---

[6] At Petitioner's resentencing trial, evidence was presented that Mr. Hulsey had told police, and had previously testified, that it was Petitioner who said "get down" (2000 Trial Tr. III, 542, 543).

prosecutor did not deny Petitioner a fundamentally fair trial, and thus the OCCA's decision is not contrary to or an unreasonable application of Supreme Court law.

Petitioner's next complaint is the prosecutor's comment in second closing that "both Cecilia Harris and Michelle Ware have from the first time they were questioned said exactly the same thing . . ." (1994 Trial Tr. VI, 46). Asserting that the State "offered no such evidence about any prior questioning," Petitioner's contention is that the comment referred to matters beyond the presented evidence and constituted improper vouching. Petition, p. 36. Without discussion, the OCCA found that the comment did not constitute plain error. Littlejohn I, 989 P.2d at 910.

It is improper for a prosecutor to vouch for the credibility of witnesses. Douglas, 560 F.3d at 1179. "[I]mpermissible vouching occurs only when 'the jury could reasonably believe that the prosecutor is indicating a personal belief in the witness' credibility, either through explicit personal assurances of the witness' veracity or by implicitly indicating that information not presented to the jury supports the witness' testimony.'" Patton v. Mullin, 425 F.3d 788, 813 (10th Cir. 2005) (quoting United States v. Bowie, 892 F.2d 1494, 1498 (10th Cir. 1990)). In the present case, the prosecutor did not inject her personal belief as to the witnesses' veracity and there is no indication that this single comment related to matters outside the record. In examining these witnesses, the prosecutor on more than one occasion referenced their prior testimony. All but one were recalled and affirmed by the

witnesses (1994 Trial Tr. V, 80-81, 84-85, 86-87, 89-90, 101, 106-08, 111). Clearly, this was evidence about prior questioning, and the prosecutor's reference to it was not improper.

In his final allegation of prosecutorial misconduct, Petitioner alleges that the prosecutor "pretended evidence did not exist in order to confuse the jury about what it had heard . . . ." Petition, p. 36. Petitioner cites the following comment made in second closing argument:

> Mr. Rowan [defense counsel] also said something that I found quite interesting that Mr. Littlejohn couldn't have said it because the next day he was in Wichita. According to who? Did you hear anybody testify about that at any point during this trial? I didn't hear it. I would submit to you what Mr. Littlejohn said, in -- by way of his statement to Mr. Bemo was that the shooting happened on Friday, and that on Sunday or Monday he went to Wichita to be with his mother, which was like a day and a half, two days later, not the following morning.

(1994 Trial Tr. VI, 48). Petitioner asserts that this comment is in clear contradiction with his mother's testimony. Petitioner asserts that his mother "unequivocally" testified that he arrived in Wichita in the early morning hours of Saturday, June 20, 1992, the morning after the robbery. Petition, p. 37.

A review of Petitioner's mother's testimony reveals that her testimony on the matter was not unequivocal but somewhat ambiguous. Petitioner's mother was asked if she received a call from Petitioner "around June 19th or June 20th." Without referencing either date, she testified that Petitioner had called her "between 12:30 at night and maybe quarter until 1:00 in the morning." After the phone call, she was expecting Petitioner to arrive in Wichita on

a bus. Again, without reference to a particular date, she then testified that it was between 4:00 and 5:00 in the morning when Petitioner arrived in Wichita (1994 Trial Tr. V, 157-58).

Additional evidence regarding Petitioner's travel to Wichita was presented through Oklahoma City Police Officer Bob Bemo. Officer Bemo interviewed Petitioner in Wichita on June 25, 1992. He testified that Petitioner told him that a few days after the robbery he got $45 from Bethany to purchase a bus ticket to Wichita. Officer Bemo's report indicated that Petitioner actually left for Wichita on the Sunday or Monday following the Friday robbery (1994 Trial Tr. V, 137-38, 146-47, 151-52).

In light of the testimony given, it cannot be said that the prosecutor misstated the evidence. While the prosecutor did not reference the testimony of Petitioner's mother, her comment may have been a reference to the inconclusiveness of her testimony. However, even if Petitioner's mother's testimony is construed as strongly as Petitioner suggests and the prosecutor missed it, the comment did not affect the fundamental fairness of Petitioner's trial. In the context of this very statement, the prosecutor herself reminded the jury "that what the attorneys say during closing arguments is not evidence. What is evidence is what you hear coming from the witness stand" (1994 Trial Tr. VI, 48). The prosecutor told the jury that she had not heard any such evidence. If the jurors heard otherwise, it was their determination to make. At a minimum, there was a conflict in the evidence, and regardless of the argument of counsel, it was the jury's province to resolve the discrepancy. See United States v. Bush, 405 F.3d 909, 919 (10th Cir. 2005) ("The jury, as fact finder, has discretion to resolve all conflicting testimony . . . ."). Finally, while Petitioner argues that the misstatement called

into question the testimony of Cecilia Harris, Petitioner's admission to Michelle Ware remains, as does the other evidence discussed herein supporting a finding that Petitioner was the shooter.

In conclusion, for the reasons set forth above, the Court finds that Petitioner is not entitled to relief on his Ground Two claim of prosecutorial misconduct. Finding nothing unreasonable in the OCCA's determination that Petitioner was not denied a fundamentally fair trial, the Court defers to that finding.

### C.    Ground Three:    Life Without Parole Instructions.

In his Ground Three, Petitioner complains about the instructions given the jury regarding the sentencing option of life without parole. Petitioner alleges that despite the instructions given, and/or because of the instructions given, the jury remained confused about the sentencing option. As a result, Petitioner contends that he was denied a reliable sentencing hearing. Because the OCCA denied his claim, Littlejohn II, 85 P.3d at 291-94, Petitioner seeks relief from this Court by asserting that the OCCA's decision is contrary to or an unreasonable application of Simmons v. South Carolina, 512 U.S. 154 (1994), Shafer v. South Carolina, 532 U.S. 36 (2001), and Kelly v. South Carolina, 534 U.S. 246 (2002).

In Simmons, a plurality opinion, the Supreme Court held that "where the defendant's future dangerousness is at issue, and state law prohibits the defendant's release on parole, due process requires that the sentencing jury be informed that the defendant is parole ineligible." Simmons, 512 U.S. at 156. Because the jury in Simmons may have reasonably believed that Simmons could be paroled if not given a death sentence, the Court found that an

20

unacceptable "misunderstanding pervaded the jury's deliberations" - one which "had the effect of creating a false choice between sentencing petitioner to death and sentencing him to a limited period of incarceration." Id. at 161. In Shafer, a majority of the Court, addressing a new South Carolina sentencing scheme, reaffirmed the Simmons holding. Shafer, 532 U.S. at 51. In Kelly, a majority of the Court once again acknowledged Simmons as controlling authority, applying it a second time to a South Carolina case. Kelly, 534 U.S. at 248.

The Tenth Circuit has held that Simmons applies to Oklahoma's sentencing scheme. Mollett v. Mullin, 348 F.3d 902, 910 (10th Cir. 2003) (citing Johnson v. Gibson, 254 F.3d 1155 (10th Cir. 2001)). The Tenth Circuit has additionally held that a petitioner's due process rights are violated under Simmons when the following circumstances are present:

> (1) the prosecution seeks the death penalty; (2) the prosecution places the defendant's "future dangerousness . . . at issue"; (3) the jury asks for clarification of the meaning of "life imprisonment," or a synonymous statutory term; and (4) the judge's response threatens to cause "a jury's misunderstanding so the jury will . . . perceive a 'false choice' of incarceration when future dangerousness is at issue."

Mollett, 348 F.3d at 914 (citations omitted).

In the present case, it is undisputed that the first three circumstances existed. The State sought and received a death sentence for Petitioner. The matter of future dangerousness was at issue because the State alleged (and the jury ultimately found) that Petitioner was a continuing threat. Finally, the jury did send out a note requesting clarification on the life without parole option. In particular, the jury asked, "Is it possible to change the verdict of

life without parole to with parole after our verdict and without another jury verdict (by anyone)?" (2000 Trial Tr. VII, 358).

What is implicated then in the present case is the fourth circumstance. Did the trial court's response to the question cause the jury to have a misunderstanding and/or false choice between execution and a term of years sentence? After consultation with the prosecution and defense counsel, the trial court answered the jury's question as follows: "You have all the law and evidence necessary to reach a verdict . . . " (2000 Trial Tr. VII, 364). By referring the jurors back to the instructions given, the trial court reinforced the three punishment options as previously defined for them, namely, "death, imprisonment for life without parole, or imprisonment for life" (O.R. X, 1875). Thus, as the OCCA found, this answer was not "insufficient, misleading or erroneous" and "did not have the effect of creating the false choice condemned in Johnson." Littlejohn II, 85 P.3d at 292. See McCracken v. Gibson, 268 F.3d 970, 980-81 (10th Cir. 2001) (finding no Simmons error where the trial court referred the jury back to the instructions and the three available sentencing options); Johnson, 254 F.3d at 1165 (citing McGregor v. Gibson, 219 F.3d 1245 (10th Cir. 2000), for the proposition that "a trial court, in response to a jury's inquiry as to the meaning of a life sentence without parole, may simply refer the jury back to the instructions as given.").

Petitioner's reference to an earlier comment made by the trial judge does not alter the Court's conclusion. The record reflects that before the jury began deliberations, the judge gave general instructions about the deliberation process. The judge advised the jury that he

was allowed "to answer some questions . . . in some cases" (2000 Trial Tr. VII, 353). The judge then stated:

> If you get the code back that says, you have all the law and evidence necessary to reach a verdict, what that means is the answer to your question is in the instructions, it was in the evidence, or you're asking me something that's inappropriate for me to answer . . . .

(2000 Trial Tr. VII, 354). Because the jurors were given the "code" answer in response to their question, Petitioner contends that, as in <u>Johnson</u>, the jurors were in effect told that they were not to consider the matter of parole. The Court disagrees.

First, the jury was told that such an answer could have three possible meanings, not just the "inappropriate" one. Second, the "inappropriate" meaning is not as Petitioner interprets it. The judge said that the answer "you have all the law and evidence necessary to reach a verdict" could mean that it was inappropriate for him to answer, *not inappropriate for them to consider*. Nothing in the response given told the jury not to consider parole. Thus, as the OCCA determined, the present case is unlike both <u>Johnson</u> and <u>Mollett</u>.[7] <u>Littlejohn II</u>, 85 P.3d at 292.

Petitioner has also not demonstrated that the OCCA acted unreasonably when, after finding no reversible error in his case, it used <u>Littlejohn II</u> to further discuss the recurring

---

[7] In <u>Johnson</u>, the jury asked, "We need to know! Is life without parole firm - Does it mean he can *never* be paroled [?]" The trial court answered, "It is inappropriate for you to consider the question asked." <u>Johnson</u>, 254 F.3d at 1164. In <u>Mollett</u>, the jury asked, "Judge can you tell us if we find a sentence of Life without parole is the[re] any possibility of Mr. Mollett ever leaving prison for any reason whatsoever?" The trial court answered, "Matters of parole are beyond the purvue [sic] of the jury or the court to consider." <u>Mollett</u>, 348 F.3d at 907-08.

issue and offer additional guidance to trial judges faced with similar questions. Littlejohn II, 85 P.3d at 292-94. While the OCCA noted that it was concerned with the continued misconception about the effective application of life without parole, its direction to trial courts was as follows:

> Therefore, in future cases where the jury during deliberations asks, in some form or fashion, whether an offender who is sentenced to life imprisonment without the possibility of parole is parole eligible, the trial court should either [1] refer the jury back to the instructions, [2] tell the jury that the punishment options are self explanatory, or [3] advise the jury that the punishment options are to be understood in their plain and literal sense and that the defendant will not be eligible for parole if sentenced to life imprisonment without the possibility of parole. While arguably the latter response is nothing more than another way of referring the jury back to the instructions, it does force the jury to accept the plain meaning of the sentencing options and impose the sentence it deems appropriate under the law and facts of the case. We recognize trial courts are in the best position to decide which answer is best suited to the situation as the questions posed by juries come in a myriad of forms on this issue. However, we believe the latter explanation may alleviate some obvious concerns of jurors more effectively than simply telling the jury it has all the law and evidence necessary to reach a decision.

Littlejohn II, 85 P.3d at 293-94 (citations omitted). While the OCCA noted that the third option might be preferred, the OCCA acknowledged that the trial judge has discretion in choosing the explanation to give. In addition, the OCCA found that the response given in Petitioner's case, the first option, remains an acceptable response.

Without conceding that the third option would satisfy Simmons, Petitioner nevertheless asserts that he would have preferred it over the instruction actually given. However, irrespective of Petitioner's preference, Petitioner's hurdle to relief in this action is a showing that the OCCA's denial of relief on direct appeal is contrary to or an

unreasonable application of <u>Simmons</u>.  Because the trial court's response did not direct the jury away from consideration of parole but reinforced the plain meaning of the sentencing options given (death, imprisonment for life without parole, or imprisonment for life), Petitioner has not shown that the OCCA's rejection of a false dilemma situation is unreasonable.  Accordingly, Petitioner's Ground Three is denied.

### D.    Ground Four:    Notice of Aggravation Evidence.

In his Ground Four, Petitioner asserts that his due process rights were violated by the prosecution's failure to give adequate notice of certain evidence presented in support of the continuing threat aggravator.  Petitioner raised this claim in his second direct appeal.  The OCCA agreed with Petitioner that notice was insufficient; however, it denied relief by assessing the issue of prejudice and concluding that any error which may have occurred was harmless.  <u>Littlejohn II</u>, 85 P.3d at 294-96.

The evidence at issue is the testimony of the victim's brother, Bill Meers, presented at Petitioner's resentencing proceeding.  Mr. Meers testified regarding a verbal exchange he had with Petitioner at the conclusion of the first trial.  Mr. Meers testified that as Petitioner was leaving the courtroom, Petitioner said to him, "[T]he motherfucker's dead and he ain't coming back." To which Mr. Meers replied, "[J]ustice." Petitioner then said, "I killed the motherfucker, I'll kill you" (2000 Trial Tr. VI, 21).   The OCCA found that, but for the notice problem, there was no question that the evidence was admissible. <u>Littlejohn II</u>, 85 P.3d at 295.

A detailed statement regarding the development of this evidence is contained in the

OCCA's opinion and need not be repeated here. For purposes of this Court's review, it is

sufficient to acknowledge that the OCCA, applying state law, found that the notice was

insufficient. Littlejohn II, 85 P.3d at 294-95.

> Here, the State did not provide Littlejohn with adequate notice of Meers' testimony. It is true the defense had actual notice the week prior to trial that the State wanted to call Bill Meers to testify about the taunting incident that was recorded in the record at the end of Littlejohn's first trial, despite no formal written notice being provided nor the inclusion of Meers in any witness lists. However, the defense had no notice, until the fifth day of the resentencing trial, that Meers would testify about an admission by Littlejohn that he killed Meers' brother or of a personal threat to Meers. The defense had notice of only the recorded statement, and it was the portion that was not disclosed that was relevant. Without the threat to Meers, the recorded statement likely would have been ruled inadmissible. It was the admission and threat that made the statements relevant. The prosecutor had a duty to disclose the unrecorded portion of the statement once she learned of it. As such, it cannot be said on this record that the notice was sufficient.

Id. at 295. Having found the notice to be insufficient, the OCCA proceeded to determine

whether Petitioner was prejudiced.

The OCCA found that "the prejudice stemming from the lack of notice, if not

eliminated, was significantly reduced" by the fact that the defense was given an opportunity

to develop a defense to the evidence. Id. at 296. In particular, the OCCA found:

> The record shows that after the *in camera* hearing, the trial court gave the defense some time to try and find the guards who were escorting Littlejohn when he allegedly made the statement to Meers. [FN10: The *in camera* hearing was held on Friday, November 3, 2000. The defense was given the weekend and Monday to prepare for Meers' testimony.] Although the defense was unable to find those guards, [FN11: The names of the guards could not be ascertained due to the record keeping used at that time.] they did locate and call Sgt. Grimsley, who was in charge of security and courtroom guard details

during Littlejohn's first trial. Grimsley explained how defendants were escorted from the courtroom following verdicts at that time. According to Grimsley, it would be highly unlikely that a defendant would be able to stop and make any kind of statement to a victim's family, and if an incident did occur, a write-up would have been made. The defense also called Littlejohn, who admitted that he made the first remark to Meers, but denied telling Meers that he had shot his brother or that he threatened to kill Meers.

Id. at 295-96.

In making its assessment, the OCCA acknowledged two other related matters raised

by Petitioner.

Littlejohn claims he was not only prejudiced by the lack of notice, but that the error was compounded by the prosecutor's improper bolstering of Meers' testimony. During re-direct, the prosecutor elicited from Meers that she was one of the prosecutors in Littlejohn's first trial and that she had been present in the courtroom. The prosecutor then asked, "so in terms of you never having told anyone about those statements, were you aware that I was present and heard?". Defense counsel objected, and the trial court sustained the objection and admonished the jury to disregard the question. Littlejohn contends the question insinuated that the prosecutor heard the entire statement thereby bolstering Meers' testimony when, in fact, the prosecutor claimed that she had only recently learned of the unrecorded portion of Meers' statement. He also contends the error was exacerbated by the rebuttal testimony of Judy Bush, the Oklahoma City Police Department's homicide victim liason [sic], who claimed she heard Littlejohn's entire statement to Meers.

Id. at 295. The OCCA found no error with the same. In particular, the OCCA held:

As far as Littlejohn's complaint about the rebuttal testimony of Judy Bush, he opened the door to it by taking the stand and denying the admission and threat to Meers, and he cannot now complain. With respect to the prosecutor's question insinuating that she, too, heard the remark, the trial court sustained the defense's objection to the question and admonished the jury to disregard it. We have typically found that such action is sufficient to cure the error.

Id. at 296.

The OCCA's final assessment of the prejudice issue included an evaluation of all the continuing threat evidence presented at trial. Upon review of this evidence, which the OCCA found to be "substantial," the OCCA concluded that "any error stemming from the insufficient notice of Meers' statement was harmless beyond a reasonable doubt." Id. at 296.

In denying Petitioner relief, the OCCA applied Chapman v. California, 386 U.S. 18 (1967). In Chapman, the Supreme Court held that "before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." Chapman, 386 U.S. at 24. In this proceeding, however, the appropriate standard of review is that set forth in Brecht v. Abrahamson, 507 U.S. 619 (1993). Fry v. Pliler, 551 U.S. 112, 121-22 (2007) (the Brecht standard applies to Section 2254 cases regardless of whether the state court recognized the error and reviewed it under Chapman). Therefore, the question is whether the alleged error "'had [a] substantial and injurious effect or influence in determining the jury's verdict.'" Brecht, 507 U.S. at 631 (quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946)). "[A] 'substantial and injurious effect' exists when the court finds itself in 'grave doubt' about the effect of the error on the jury's verdict." Bland v. Sirmons, 459 F.3d 999, 1009 (10th Cir. 2006) (quoting O'Neal v. McAninch, 513 U.S. 432, 435 (1995)). "'Grave doubt' exists where the issue of harmlessness is 'so evenly balanced that [the court] feels [itself] in virtual equipoise as to the harmlessness of the error.'" Id.

It is undoubtedly clear that the issue here is the lack of notice. As the Tenth Circuit has acknowledged, "a defendant must have a meaningful opportunity to deny or explain the

State's evidence used to procure a death sentence." <u>Duvall v. Reynolds</u>, 139 F.3d 768, 797 (10th Cir. 1998) (citing <u>Gardner v. Florida</u>, 430 U.S. 349, 362 (1977)). While the OCCA found the State's notice to be insufficient, it also found that Petitioner was given an opportunity to deny the State's evidence. <u>See</u> *Order Granting Rehearing*, p. 3 ("any prejudice/error from the lack of sufficient notice of Bill Meers' testimony 'if not eliminated, was significantly reduced' by the trial court's actions in giving defense counsel time to amount a defense to Meers' testimony."). Petitioner received complete notice of Mr. Meers' testimony on a Friday. Petitioner's trial did not reconvene until the following Tuesday. Given that time period, Petitioner was able to locate and present for testimony the officer who was in charge of courtroom security during Petitioner's first trial. Sgt. William Grimsley testified that he had received an inquiry from defense counsel on Friday afternoon regarding the identities of the guards assigned to Petitioner at his first trial; however, despite an extensive search, issues with record keeping prevented him from discovering this information. Nevertheless, Sgt. Grimsley was able to testify about the procedures employed at that time. He testified that when removing a defendant from the courtroom, the defendant would not have been allowed to stop and speak to the victim's family, as Mr. Meers had testified (2000 Trial Tr. VI, 66-68). Petitioner testified about the incident as well. According to Petitioner, after the verdict was read, the victim's family was saying "justice, justice, justice." Petitioner asserted that as he was walking by, his only comment was "fuck you" (2000 Trial Tr. VII, 242).

In addition to the fact that Petitioner was able to counter the evidence presented, the OCCA also examined the significance of the evidence and whether the lack of sufficient notice affected the jury's finding of the continuing threat aggravator. Given the substantial evidence presented in support of the continuing threat aggravator, Mr. Meers' testimony was just a small part of the bigger picture.

> The State presented evidence that Littlejohn had been incarcerated for all but a few months from the time he was 15-years-old until he committed this crime at the age of 20. The State introduced evidence that showed Littlejohn's tendency toward violence had begun in elementary school, where he was placed in a class for the emotionally disturbed and he continued to get in trouble for his behavior. The State presented evidence that Littlejohn had been involved in robberies, assaults and a rape. In addition, the State introduced evidence of numerous infractions, some violent, while Littlejohn was in the Oklahoma County Jail awaiting his first trial, as well as incidents that occurred while Littlejohn was imprisoned in the Department of Corrections (DOC).

> Although Littlejohn defended against the continuing threat aggravator on the theory that he had matured in prison and was no longer a threat, as evidenced by the fact that he had received no misconduct write-ups at DOC in the three years prior to his resentencing trial and the fact that he had received excellent adjustment reports, Littlejohn admitted on the stand that he had beaten up another inmate for a pack of cigarettes the year before his resentencing trial.

Littlejohn II, 85 P.3d at 296. Thus, the OCCA concluded that "the lack of notice problem was cured so that Meers' testimony was properly admitted and the due process error was harmless beyond a reasonable doubt as it did not contribute to the verdict." *Order Granting Rehearing*, p. 3.

For the same reasons espoused by the OCCA, this Court cannot conclude that the lack of sufficient notice of Mr. Meers' testimony had a substantial and injurious effect on the jury's verdict.[8]  Accordingly, Petitioner is denied relief on his Ground Four.

### E.    Ground Five:        Witness Unavailability.

In his Ground Five, Petitioner asserts error in the admission of the testimony of Michelle Ware and Cecilia Harris. Without a showing of unavailability, the State was allowed to introduce the testimony of both these witnesses at Petitioner's resentencing proceeding.  When Petitioner raised this claim in his second direct appeal, the OCCA agreed with Petitioner that the testimony should not have been admitted without a finding of unavailability.  However, the OCCA denied Petitioner relief, finding that the error was harmless beyond a reasonable doubt.  Littlejohn II, 85 P.3d at 296-98.

Michelle Ware and Cecilia Harris are sisters.  Both of them testified in Petitioner's first trial regarding their contact with Petitioner and co-defendant Bethany on the day of the robbery.  At the time of the robbery, Ms. Ware was Bethany's girlfriend.  The most important aspect of their testimony was an admission they heard Petitioner make about the robbery.  Ms. Ware testified that she heard Petitioner say that he did not mean to shoot Mr. Meers who came after him with a broom. Ms. Harris testified similarly, but recalled that Petitioner said that Mr. Meers had a gun in his hand.  The memories of both witnesses had to be refreshed

---

[8] As to the related allegations of error, the prosecutor's examination of Mr. Meers and the State's rebuttal witness, the Court finds these tangential issues were appropriately addressed by the OCCA's decision as well.

with prior testimony, and there was a discrepancy between them as to who was present and when the statement was made (1994 Trial Tr. V, 74-116).

At trial, Petitioner did object on the matter of unavailability. However, pursuant to the state statute regarding capital resentencing proceedings, Okla. Stat. tit. 21, § 701.10a(4) (Supp. 1993), the prior testimony was deemed admissible. Littlejohn II, 85 P.3d at 296-97. On appeal, the OCCA held for the first time that Section 701.10a(4) had to be construed to meet constitutional safeguards. In accordance with Ohio v. Roberts, 448 U.S. 56 (1980), the OCCA held that "before the prior testimony permitted under § 701.10a(4) may be admitted in a subsequent resentencing proceeding, the State must show that the declarant is unavailable and that the statement bears an adequate 'indicia of reliability.'" Littlejohn II, 85 P.3d at 297 (quoting Roberts).[9]  Because the prior testimony was admitted without a finding of unavailability, the OCCA undertook a harmless error analysis. Id. at 297-98.

In conducting its harmless error analysis, the OCCA found guidance in the Supreme Court's decision in Delaware v. Van Arsdall, 475 U.S. 673 (1986). Littlejohn II, 85 P.3d at 297-98. In that case, the Court held that the failure to afford a defendant the opportunity to impeach a witness for bias was subject to harmless error analysis. While the determination

_____

[9] In Crawford v. Washington, 541 U.S. 36 (2004), the Supreme Court rejected Roberts' "indicia of reliability" standard where testimonial evidence is concerned. "Where testimonial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually proscribes: confrontation." Crawford, 541 U.S. at 69. Crawford left intact the first requirement of unavailability. Id. at 68. Because the issue in the present case is unavailability, Crawford does not affect its resolution. Even under Crawford, the second requirement, confrontation, was met. As the admitted evidence was testimony given at Petitioner's first trial, it is clear that Petitioner had a prior opportunity for cross-examination. Id.

"depends upon a host of factors," the Court noted the following factors for consideration: "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case."  Van Arsdall, 475 U.S. at 684.  See also Coy v. Iowa, 487 U.S. 1012, 1021-22 (1988) ("An assessment of harmlessness cannot include consideration of whether the witness' testimony would have been unchanged, or the jury's assessment unaltered, had there been confrontation; such an inquiry would obviously involve pure speculation, and harmlessness must therefore be determined on the basis of the remaining evidence.").  The OCCA analyzed the issue as follows:

> The record shows the entire examination of both witnesses was read to the jury. The testimony had an adequate indicia of reliability as both Ware and Harris were thoroughly cross-examined by defense counsel. In addition, the testimony was taken under oath at Littlejohn's first trial and was transcribed by a licensed court reporter, thereby providing an adequate record. The cross-examination of both Harris and Ware at Littlejohn's first trial was conducted by the same highly competent defense attorney who represented Littlejohn at his resentencing trial. Defense counsel exposed the bias of both Harris and Ware and challenged the accuracy of their perceptions and memories. In addition, their testimony was not the only evidence offered to show that Littlejohn was the triggerman. Although he did not see Appellant fire the fatal shot, Tony Hulsey, the store clerk robbed at the counter, saw Appellant with a gun as Meers approached and believed Appellant was the triggerman. Hulsey's testimony corroborated Ware's and Harris' testimony that Littlejohn shot Meers as Meers approached him with a broom. On the record before us, we find that the error was harmless beyond a reasonable doubt.

Littlejohn II, 85 P.3d at 298.

Although Petitioner takes issue with the OCCA's discussion of indicia of reliability in light of Crawford, it is clear that the OCCA's characterization of the witnesses' prior testimony as "adequate indicia of reliability" is in fact consistent with Crawford. As previously noted, the Supreme Court held in Crawford that "the only indicium of reliability sufficient to satisfy constitutional demands is . . . confrontation." Crawford, 541 U.S. at 69. In the present case, Petitioner was given the prior opportunity to cross-examine the witnesses. Constitutional reliability was therefore established.

Another relevant consideration made by the OCCA was that the entire examination of the witnesses was read to the jury. The jury was not read only select portions favorable to the prosecution, but the witnesses' complete testimony. The jury was therefore privy to matters brought out by defense counsel about the witnesses' bias and the accuracy of their recollections.

Finally, while the witnesses' testimony supported the conclusion that Petitioner was the one who fired the shot that killed Mr. Meers, it was not the only evidence. Tony Hulsey testified that Petitioner was the only one with a gun, that the gun was a .380 automatic, and that he saw Petitioner point the gun toward Mr. Meers just seconds before the shot was fired. Mr. Hulsey testified that he had no doubt that Petitioner was the shooter (2000 Trial Tr. III, 519-20, 523, 527-28). Additional evidence showed that all of the bullet fragments found at the scene were part of a single .380 bullet (1994 Trial Tr. V, 71-72; 2000 Trial Tr. IV, 637).

While the OCCA addressed the harmlessness of the error under Chapman, this Court reviews it under Brecht. Fry, 551 U.S. at 121-22. See Brown v. Uphoff, 381 F.3d 1219,

1226-27 (10th Cir. 2004) ("Confrontation Clause violations are subject to harmless error analysis and thus may be excused depending on the state of the evidence at trial."). Under Brecht, the Court finds that, for the reasons discussed above, the prosecution's failure to make a showing of unavailability prior to the admission of Ms. Ware and Ms. Harris's testimony did not have a substantial and injurious effect on the jury's verdict. Petitioner is therefore not entitled to relief on his Ground Five.

### F.     Ground Six:         Admission of Petitioner's Prior Testimony.

In his Ground Six, Petitioner asserts error in the admission of his prior testimony. Over Petitioner's objection, the testimony he gave at his first trial was read to the jury at his resentencing proceeding.[10]   Relying on Harrison v. United States, 392 U.S. 219 (1968), Petitioner asserts that his prior testimony should not have admitted because he was impelled to testify.   Petitioner presented this claim to the OCCA in his second direct appeal. Assuming that Harrison applied, the OCCA found that any error which may have occurred was harmless beyond a reasonable doubt.  Littlejohn II, 85 P.3d at 298-99.

In Harrison, a defendant complained about the admission of his prior testimony.  In his first trial, Harrison only testified to counter three confessions introduced against him.  On appeal, it was determined that the confessions were illegally obtained and therefore

---

[10] The State introduced Petitioner's prior testimony in support of the continuing threat aggravator (O.R. IX, 1681).  In the second stage of his original sentencing proceeding, Petitioner testified about his upbringing, his criminal past, his prior incarcerations, and his participation in the charged crimes (1994 Trial Tr. VIII, 58-198). All of this prior testimony, with the exception of the portion relating to Lawrence Tingle, was read to the jury at his resentencing proceeding (1994 Trial Tr. VIII, 107 (line 18) - 111 (line 9); 2000 Trial Tr. V, 799-802).

erroneously admitted. On retrial, the confessions were not introduced, but Harrison's prior testimony was. The question before the Supreme Court was "whether [Harrison's] trial testimony was the inadmissible fruit of the illegally procured confessions." Harrison, 392 U.S. at 220-21. The Court found that it was. "[T]he same principle that prohibits the use of confessions [wrongfully obtained] also prohibits the use of any testimony impelled thereby - the fruit of the poisonous tree . . . ." Id. at 222. "The question is not *whether* the petitioner made a knowing decision to testify, but *why*. If he did so in order to overcome the impact of confessions illegally obtained and hence improperly introduced, then his testimony was tainted by the same illegality that rendered the confessions themselves inadmissible." Id. at 223.

While the OCCA assumed, without deciding, that Harrison applied to Petitioner's claim, Petitioner's claim does not fall squarely under its holding. Most distinguishable is the fact that Petitioner's claim does not involve an illegally obtained confession. See Oregon v. Elstad, 470 U.S. 298, 316-17 (1985) (citing Harrison for the proposition that admission of a defendant's testimony on retrial is barred where an inadmissible confession compelled him to testify in the first instance). See also Humphreys v. Gibson, 261 F.3d 1016, 1023 (10th Cir. 2001) (discussing the holding of Harrison and citing to Elstad). In his first trial, the State introduced evidence through a fellow county jail inmate, Lawrence Tingle, that Petitioner had not only admitted to shooting Mr. Meers, but to hiring someone to kill his ex-girlfriend and their baby in Tulsa. This evidence was presented in the second stage in support of the continuing threat aggravator. On appeal, Petitioner claimed that Tingle should not have been

allowed to testify regarding the Tulsa murders. Petitioner asserted that his due process rights were violated by the prosecution's failure to present corroborative evidence demonstrating the trustworthiness of the admissions. The OCCA agreed and granted Petitioner a new resentencing proceeding. <u>Littlejohn I</u>, 989 P.2d at 910-12.

<u>Harrison</u>'s holding is explicitly based on the poisonous tree doctrine, a doctrine that deals exclusively with violations of Fourth Amendment rights. <u>See</u> <u>United States v. Jarvi</u>, 537 F.3d 1256, 1259 (10th Cir. 2008). The issue in Petitioner's first trial which allegedly prompted his testifying was not a violation of the Fourth Amendment but due process. The Court is not convinced that <u>Harrison</u> applies to Petitioner's case. Pursuant to Section 2254(d)(1), Petitioner's entitlement to relief arises from clearly established Supreme Court law. "[C]learly established law consists of Supreme Court holdings in cases where the facts are at least closely-related or similar to the case *sub judice*. Although the legal rule at issue need not have had its genesis in the closely-related or similar factual context, the Supreme Court must have expressly extended the legal rule to that context." <u>House v. Hatch</u>, 527 F.3d 1010, 1016 (10th Cir. 2008). Since <u>Harrison</u> was decided in 1968, the Supreme Court has not revisited the issue nor given any indication that <u>Harrison</u> extends beyond its facts. Accordingly, the Court finds that Petitioner's reliance on <u>Harrison</u> does not satisfy his burden under Section 2254(d)(1).

However, the Court also agrees with the OCCA that even if <u>Harrison</u> applies, any error which may have occurred was harmless. In determining that any error in the admission

of Petitioner's testimony was harmless beyond a reasonable doubt, the OCCA reasoned as follows:

> First, and maybe foremost, the prosecutor neither called Tingle to testify nor did she introduce Littlejohn's prior testimony that referred to Tingle or any statements Littlejohn made to Tingle. Second, the remainder of Littlejohn's prior testimony that was introduced was cumulative to other evidence that was admitted at the resentencing trial. The jury at resentencing heard all about Littlejohn's early childhood and family problems, his difficulties in school, his prior criminal record/activity, his behavior problems while incarcerated, the events surrounding the robbery of the Root-N-Scoot and his remorse. Finally, Littlejohn testified again at the resentencing trial where he was thoroughly cross-examined on a majority of the subjects covered during his first-trial testimony. Based on this record, we find no relief is warranted.

Littlejohn II, 85 P.3d at 298-99. Applying the even more deferential Brecht standard, see Fry, 551 U.S. at 121-22, the Court concludes that the admission of Petitioner's prior testimony at resentencing did not have a substantial and injurious effect on the jury's verdict. Petitioner's Ground Six is denied.

### G. Ground Seven: Prosecutorial Misconduct in the Second Stage.

In his Ground Seven, Petitioner raises several allegations of prosecutorial misconduct from his resentencing proceeding. Petitioner included this claim in his second direct appeal. The OCCA denied relief. Littlejohn II, 85 P.3d at 300-01. Because the OCCA addressed the claim on the merits, Petitioner is only entitled to relief upon a showing that the OCCA's decision is contrary to or an unreasonable application of Supreme Court law. Petitioner has not met this burden.

Generally, allegations of prosecutorial misconduct are subjected to due process review. Hamilton v. Mullin, 436 F.3d 1181, 1187 (10th Cir. 2006). The question is whether

38

the prosecutor's actions or remarks "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Donnelly, 416 U.S. at 643. See Article IV.B., supra. A different standard applies, however, where a petitioner asserts the denial of a specific constitutional right. "When specific guarantees of the Bill of Rights are involved, . . . special care [is taken] to assure that prosecutorial conduct in no way impermissibly infringes them." Donnelly, 416 U.S. at 643. "[A] claim that the misconduct effectively deprived the defendant of a specific constitutional right . . . may be the basis for habeas relief without proof that the entire proceeding was unfair." Paxton v. Ward, 199 F.3d 1197, 1217 (10th Cir. 1999).

## 1. Direct Examination of Mr. Meers.

Petitioner's initial complaint is related to his Ground Four and concerns a question posed to Mr. Meers on redirect examination. After confirming with Mr. Meers that she, too, was present in the courtroom when Petitioner made the statements about which Mr. Meers testified, the prosecutor then asked, "So in terms of you never having told anyone about those statements, were you aware that I was present and heard?" Petitioner's objection to this question was sustained. At Petitioner's request, the jury was also instructed to disregard it (2000 Trial Tr. VI, 26). Because Petitioner's objection had been sustained and the jury was admonished to disregard it, the trial court denied Petitioner's motion for a mistrial (2000 Trial Tr. VI, 31-33).

Referring back to its resolution of the issue regarding admission of Mr. Meers' testimony, the OCCA found that no relief was warranted for this alleged error. Littlejohn II, 85 P.3d at 300. Earlier in its opinion, the OCCA held:

> With respect to the prosecutor's question insinuating that she, too, heard the remark, the trial court sustained the defense's objection to the question and admonished the jury to disregard it. We have typically found that such action is sufficient to cure the error.

Id. at 296. The Court does not find the OCCA's determination to be unreasonable. See Wilson v. Sirmons, 536 F.3d 1064, 1119 (10th Cir. 2008) ("Even if the prosecutor's comments were improper, however, the trial court's admonition to the jury cured any error."), reh'g en banc granted, 549 F.3d 1267 (10th Cir. 2008), opinion reinstated by Wilson v. Workman, 577 F.3d 1284 (10th Cir. 2009); Le, 311 F.3d at 1013 (noting that a fundamental fairness includes consideration of "[a]ny cautionary steps - such as instructions to the jury - offered by the court to counteract improper remarks . . . .").

## 2. Discovery.

Next, Petitioner complains that he was ambushed by the prosecution's failure to comply with the Oklahoma Criminal Discovery Code. Petitioner's particular complaint is that, pursuant to the Code, the prosecution should have provided him with records from the Oklahoma County Jail regarding his conduct while incarcerated there from 1994 to 1997. The prosecution used these records in conducting cross-examination of Petitioner's expert, Dr. Wanda Draper.

In denying Petitioner relief on this claim, the OCCA specifically found that "[t]here is no duty under the Discovery Code for the State to furnish the defense with evidence it intends to use solely to cross-examine a defense witness." Littlejohn II, 85 P.3d at 301. The Court is bound by this determination. "A state court's 'interpretation of [a] state . . . statute is a matter of state law binding on this court' in habeas proceedings." Smith v. Dinwiddie, 510 F.3d 1180, 1190 (10th Cir. 2007) (quoting Parker v. Scott, 394 F.3d 1302, 1319 (10th Cir. 2005)). Given the OCCA's interpretation of the Oklahoma Criminal Discovery Code, there was no discovery violation, and thus the prosecutor committed no misconduct. See also Wilson, 536 F.3d at 1102-03 (finding no protected liberty interest in Oklahoma's discovery code and acknowledging the lack of a constitutional right to non-exculpatory discovery).

### 3. Argument.

Petitioner additionally contends that the prosecution made improper comments during closing argument. In denying Petitioner relief on this claim, the OCCA held as follows:

> Lastly, Littlejohn cites numerous instances during closing argument that he claims were improper. A review of the record shows the majority of remarks were proper comments that fall within the wide range of argument permitted during closing argument. Any borderline remarks did not deny Littlejohn a fair resentencing trial. As such, we find no relief is required.

Littlejohn II, 85 P.3d at 301 (citations omitted). While Petitioner takes issue with the OCCA's consideration of the claim, the Court affords it deference and finds that it is not contrary to or an unreasonable application of Supreme Court law. As previously noted, see Article IV.B., supra, "a criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone, for the statements or conduct must be viewed in

41

context; only by so doing can it be determined whether the prosecutor's conduct affected the fairness of the trial." Young, 470 U.S. at 11.

Petitioner's initial contention is that the prosecutor misstated the law in first closing argument. In discussing Instruction No. 6, the Edmund/Tison instruction, the prosecutor told the jurors that they first had to consider Petitioner's degree of participation. The prosecutor argued that because Petitioner was the one who shot Mr. Meers, the jury was then authorized to consider the death penalty (2000 Trial Tr. VII, 262-64). Petitioner did not object to the comment, but asserts that it was incorrect because the jury was not authorized to consider the death penalty until it found an aggravating circumstance and that the aggravation evidence outweighed the mitigation evidence. The Court finds no misstatement in the prosecutor's comment, especially when viewed in light of her additional argument. Petitioner's degree of participation was a consideration in imposing the death penalty. However, the prosecutor was abundantly clear that imposition of the death penalty required additional findings. Considered in total, the prosecutor's argument was an accurate discussion of the sentencing procedure. In addition, the given instructions properly outlined the procedure as well. See Weeks v. Angelone, 528 U.S. 225, 234 (2000) ("A jury is presumed to follow its instructions.").

Petitioner's next complaint concerns the prosecutor's reference in second closing argument to appellate review. At resentencing, Petitioner was allowed to introduce portions of the prosecution's closing argument from the Bethany trial. Petitioner then argued that the prosecutor's theories at the two trials were inconsistent, unjust, and unfair (2000 Trial

Tr. VII, 248-49, 282, 285, 287, 301-02).  <u>See</u> Article IV.A., <u>supra</u>.  In response to the argument, the prosecutor stated as follows:

> Mr. Rowan [defense counsel] has told you that basically Ms. Stensaas [the prosecutor] did something that was wrong, it was improper, there was something wrong with what she did and he full well knows that that has been reviewed by appellate courts.

(2000 Trial Tr. VII, 312).  Petitioner objected to the comment because it referred to matters not in evidence, and the trial court directed the prosecutor to stay within the record.  The prosecutor then continued, "If there was something wrong with Ms. Stensaas' closing argument, you would be told that" (2000 Trial Tr. VII, 313-14).

It is Petitioner's contention that the prosecutor's comment is a clear violation of <u>Caldwell v. Mississippi</u>, 472 U.S. 320 (1985). In <u>Caldwell</u>, the Supreme Court held that "it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's sentence rests elsewhere." <u>Caldwell</u>, 472 U.S. at 328-29. In <u>Caldwell</u>, the prosecutor argued that the jury's return of a death sentence was not final. In particular, the prosecutor told the jury, "Your job is reviewable," and "the decision you render is automatically reviewable by the Supreme Court." <u>Id.</u> at 325-26.  In the present case, while the prosecutor did make reference to the appellate process, it did not degrade the jury's sentencing responsibility.  The comment was a reference to the prosecutor's actions and whether the prosecution had acted inappropriately.  These circumstances do not equate to a <u>Caldwell</u> violation.

Petitioner's final allegation of improper argument concerns two comments which he contends were inappropriate personal opinions of justice. In first closing argument, the prosecutor stated, "You are the representatives of the community that have been chosen as jurors in this case and it's your job to decide what is justice in this case" (2000 Trial Tr. VII, 279). In second closing, the prosecutor additionally remarked, "[Y]ou are the twelve representatives of this community in which we all live to decide what is justice. And what is justice in this case is the death penalty" (2000 Trial Tr. VII, 350). Petitioner did not object to either comment.

While "[i]t is improper for a prosecutor to suggest that a jury has a civic duty to convict," Thornburg, 422 F.3d at 1134, the prosecutor's comments in the present case did not cross an acceptable line. Simply incorporating the word "justice" does not make an argument improper. A "justice" argument becomes inappropriate when it strays from the presented evidence and plays upon the jury's emotion, encouraging a death sentence based on vengeance and/or outrage. Wilson, 536 F.3d at 1121. Such did not occur here. Just as Petitioner found them unobjectionable to at trial, so this Court agrees with the OCCA that these comments did not deny Petitioner a fair sentencing proceeding.

### 4.      Conclusion.

In summary, for the reasons set forth above, the Court finds that Petitioner is not entitled to relief on his Ground Seven claim of prosecutorial misconduct. Finding nothing unreasonable in the OCCA's determination that Petitioner was not denied a fundamentally fair trial, the Court defers to that finding.

**H.     Ground Eight:          Jury's Weighing of Aggravating and Mitigating Circumstances.**

In his Ground Eight, Petitioner argues that <u>Ring v. Arizona</u>, 536 U.S. 584 (2002), requires Oklahoma capital juries to find beyond a reasonable doubt that the aggravating circumstances outweigh the mitigating circumstances.  Because the reasonable doubt standard was not applied in his case,[11] Petitioner asserts that his death sentence must be vacated.  Petitioner presented this claim to the OCCA in his second direct appeal.  The OCCA, relying on its holding in <u>Torres v. State</u>, 58 P.3d 214 (Okla. Crim. App. 2002), denied Petitioner relief.  <u>Littlejohn II</u>, 85 P.3d at 302.

In <u>Ring</u>, the Supreme Court addressed a capital defendant's right to a jury trial.  The Court reviewed an Arizona procedure which allowed the trial judge, alone and after a jury verdict finding a defendant guilty of first degree murder, to determine the appropriate sentence.  Under Arizona law, a death sentence could not be imposed unless at least one aggravating circumstance was found beyond a reasonable doubt.  <u>Ring</u>, 536 U.S. at 588, 597. At the sentencing hearing, to be conducted by the same judge who tried the case, the judge

---

[11] The jury was instructed as follows:

> If you unanimously find that one or more of the aggravating circumstance or circumstances existed beyond a reasonable doubt, the death penalty shall not be imposed unless you also unanimously find that any such aggravating circumstance or circumstances outweigh the finding of one or more mitigating circumstances. Even if you find that the aggravating circumstance or circumstances outweigh the mitigating circumstance or circumstances, you may impose a sentence of imprisonment for life or imprisonment for life without parole.

(O.R. X, 1894).

was directed to evaluate both the aggravating and mitigating circumstances. The judge was then authorized to impose a sentence of death "only if there is at least one aggravating circumstance and 'there are no mitigating circumstances sufficiently substantial to call for leniency.'" Id. at 592-93 (citation omitted). In Ring, the judge found two aggravating circumstances and one mitigating circumstance. Finding that the mitigating circumstance did not warrant leniency, the judge sentenced Ring to death. Id. at 594-95.

The Supreme Court found that Arizona's capital procedure violated the Sixth Amendment. "Capital defendants . . . are entitled to a jury determination of any fact on which the legislature conditions an increase in their maximum punishment." Id. at 589. "If a State makes an increase in a defendant's authorized punishment contingent on the finding of a fact, that fact - no matter how the State labels it - must be found by a jury beyond a reasonable doubt." Id. at 602. Because Arizona law provides that a death sentence is unauthorized in the absence of at least one aggravating circumstance, the Court found that "Arizona's enumerated aggravating factors operate as 'the functional equivalent of an element of a greater offense,'. . . [and therefore] the Sixth Amendment requires that they be found by a jury." Id. at 609 (quoting Apprendi v. New Jersey, 530 U.S. 466 (2000)) (citation omitted).

As noted above, in denying Petitioner relief on his claim, the OCCA cited its decision in Torres. In Torres, the OCCA found that Oklahoma's capital procedure was consistent with Ring. The OCCA detailed the procedure as follows:

In Oklahoma, jurors are the actual and ultimate fact-finders throughout both stages of a capital trial. A defendant is only eligible for the death penalty if one or more aggravating circumstances are present. Where the case is tried to a jury, jurors make the factual findings that aggravating circumstances exist. Jurors must find any aggravating circumstances unanimously beyond a reasonable doubt. At that point, the jury may consider imposing a sentence of death. However, jurors must find that aggravating circumstances outweigh mitigating evidence before imposing a death sentence, and even then jurors are not required to impose death.

Torres, 58 P.3d at 216 (footnotes omitted). As to its compliance with Ring, the OCCA stated:

Ring describes a substantive element of a capital offense as one which makes an increase in authorized punishment contingent on a finding of fact. Using this description, the substantive element of capital murder in Oklahoma is the jury's finding of the aggravating circumstance necessary to support a capital sentence. It is that finding, not the weighing of aggravating and mitigating circumstances, that authorizes jurors to consider imposing a sentence of death. That is, the increase in punishment from life imprisonment without parole to the death penalty is contingent on the factual finding of an aggravating circumstance. . . . Oklahoma's provision that jurors make the factual finding of an aggravating circumstance beyond a reasonable doubt is all that Ring requires. Once that finding is made, the substantive elements of the capital crime are satisfied.

Id. (footnote omitted).

It is Petitioner's contention that the OCCA's application of Ring is erroneous. Because the jury must find that the aggravators outweigh the mitigators, Petitioner asserts that it is a factual finding which must be made before a death sentence may be imposed. Thus, in accordance with Ring, it must be determined beyond a reasonable doubt. The Court disagrees.

47

Ring's focus is on death eligibility, not the ultimate, highly discretionary sentencing decision. The issue in Ring was the judicial determination of the prerequisite for the death penalty - that particular finding which allowed the defendant's sentence to be enhanced. While the judge in Ring not only made this finding but weighed the aggravators and mitigators as well, the Supreme Court did not address this additional consideration or in any way imply that the weighing process was subject to its holding. In addition, Supreme Court precedent establishes "that a State enjoys a range of discretion in imposing the death penalty, including the manner in which aggravating and mitigating circumstances are to be weighed." Kansas v. Marsh, 548 U.S. 163, 174 (2006). The Supreme Court has "'never held that a specific method for balancing mitigating and aggravating factors in a capital sentencing proceeding is constitutionally required.'" Id. at 175 (quoting Franklin v. Lynaugh, 487 U.S. 164, 179 (1988)). In the present case, the jury found beyond a reasonable doubt two aggravators which supported the imposition of death sentence. Supreme Court precedent requires nothing more.

The Tenth Circuit reached this same conclusion in Matthews v. Workman, 577 F.3d 1175 (10th Cir. 2009). In Matthews, an Oklahoma capital habeas petitioner, relying on both Apprendi and Ring, argued that his jury should have been instructed to find that the aggravating circumstances outweighed the mitigating circumstances beyond a reasonable doubt. Without this determination, Matthews argued his death sentence was invalid. Relying on its decision in United States v. Barrett, 496 F.3d 1079, 1107 (10th Cir. 2007), the Tenth Circuit found no merit to the claim. In particular, the Court found that the jury's weighing

of the factors in aggravation and mitigation "is not a finding of fact subject to <u>Apprendi</u> but a 'highly subjective, largely moral judgment regarding the punishment that a particular person deserves.'" <u>Matthews</u>, 577 F.3d at 1195 (quoting <u>Barrett</u>).

For the foregoing reasons, Petitioner's Ground Eight must be denied. Petitioner has failed to show that the decision of the OCCA is contrary to or an unreasonable application of <u>Ring</u>.

## I.    Ground Nine:    Cumulative Error.

In his Ground Nine, Petitioner alleges that he is entitled to relief due to cumulative error. In support of his request for relief, Petitioner references his Grounds One through Eight. In his Ground Twelve, Petitioner additionally requests that it, too, be considered for its cumulative effect.

As recognized by the Tenth Circuit, "[t]he cumulative effect of two or more individually harmless errors has the potential to prejudice a defendant to the same extent as a single reversible error. The purpose of a cumulative-error analysis is to address that possibility." <u>United States v. Rivera</u>, 900 F.2d 1462, 1469 (10th Cir. 1990). "A cumulative-error analysis merely aggregates all the errors that individually have been found to be harmless, and therefore not reversible, and it analyzes whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless." <u>Id.</u> at 1470. In capital cases, the focused inquiry is "whether the errors 'so infected the trial with unfairness as to make the resulting conviction a denial of due process, or rendered the sentencing fundamentally unfair in light of the heightened degree of

reliability demanded in a capital case.'" Wilson, 536 F.3d at 1122 (quoting Thornburg, 422 F.3d at 1137).

Cumulative error review considers "only the effect of matters determined to be error, not the cumulative effect of non-errors." Rivera, 900 F.2d at 1471. Of the grounds denoted by Petitioner for consideration as cumulative error, the Court has found error in five. Of these five errors, one concerns Petitioner's retrospective competency hearing (Ground Twelve), one occurred in the guilt stage (Ground Two), and three occurred in the penalty stage (Grounds Four, Five and Six). As separate proceedings, before separate juries, the Court finds that these five grounds should not be considered in the aggregate. Although it has been acknowledged that first stage errors can affect the second stage result, the underlying premise is that the same jury considered both guilt and punishment. See Moore v. Johnson, 194 F.3d 586, 619 (5th Cir. 1999). See also Darks v. Mullin, 327 F.3d 1001, 1018 (10th Cir. 2003) (citing Moore and holding that "[i]n assessing cumulative error, only first stage errors are relevant to the conviction, but all errors are relevant to the sentence."); Cargle v. Mullin, 317 F.3d 1196, 1208 (10th Cir. 2003) (citing Moore and acknowledging that guilt stage error can have "a continuing, cognizable effect" on the penalty stage). Where, as here, Petitioner's death sentence was determined in a resentencing proceeding before a different jury, there is no first stage carryover concern. Petitioner's Ground Twelve stands alone as well. Therefore, having found no error warranting relief in Grounds Two and Twelve, no further consideration is due these individual errors.

Grounds Four, Five and Six remain. The OCCA found all of these claims to be harmless. This Court has concurred.[12] The OCCA also considered the cumulative effect of these errors and found that no relief was warranted. Littlejohn II, 85 P.3d at 302-03. Because the OCCA addressed this claim on the merits, AEDPA deference is due it. See Brown v. Sirmons, 515 F.3d 1072, 1097 (10th Cir. 2008) (giving deference to the OCCA's decision where habeas review found no additional constitutional errors and the OCCA addressed the entire cumulative argument); Short v. Sirmons, 472 F.3d 1177, 1197-98 (10th Cir. 2006) (same). The Court cannot say that the OCCA's determination of the issue is contrary to or an unreasonable application of clearly established federal law. See Darks, 327 F.3d at 1017 (addressing a claim of cumulative error and finding that "Supreme Court authority clearly establishes the right to a fair trial and due process."). Thus, Petitioner's Ground Nine is denied.

## J.    Ground Ten:    Ineffective Assistance of Trial Counsel.

In his Ground Ten, Petitioner asserts that his trial counsel rendered ineffective assistance at his resentencing proceeding. Petitioner's complaint with his trial counsel is his sole reliance on Dr. Wanda Draper, a developmental epistemologist, as his mitigation expert. While Dr. Draper presented the jury with a "socio-psychological account of the impact of [his] upbringing," Petitioner asserts that her testimony was incomplete because it did not

---

[12] As to Ground Six, this Court has found that Harrison is inapplicable. However, the Court has alternatively held that if Harrison does apply, any error was harmless. See Article IV.F., supra. Unsure of the application of Harrison, the OCCA assumed error and then found it to be harmless. Littlejohn II, 85 P.3d at 298.

correlate his upbringing and his mother's substance abuse during pregnancy to the physical development of his brain. Petition, pp. 105-06. Petitioner has since been evaluated by a psychiatrist whose opinion is that Petitioner has neurological deficits as a result of prenatal substance abuse and a deprived and neglected upbringing. Petition, Attachment A. Petitioner contends that with this additional evidence, there is a reasonable probability that the jury would not have sentenced him to death.

While Petitioner sought to develop this matter in state court, he was prevented from doing so. Petitioner was evaluated by Dr. Manual Saint Martin on September 16, 2005. Dr. Martin's report is dated September 26, 2005. On November 4, 2005, the Oklahoma Indigent Defense System was appointed to represent Petitioner in a second post-conviction application. On November 23, 2005, and again on December 5, 2005, pleadings were filed in OCCA Case No. PCD-2005-1155, acknowledging the 60-day time constraint of OCCA Rule 9.7(G)(3) and seeking additional time to file an application. On December 28, 2005, the OCCA dismissed the action. The OCCA held as follows:

> Under Rule 9.7(G)(3), *Rules of the Oklahoma Court of Criminal Appeals*, Title 22, Ch. 18, App. (2005), a claim in a successor application for post-conviction relief must be filed in this Court within 60 days from when the factual basis of the issue becomes available or it will not be considered. Rule 9.7(G)(3) requires the petitioner to file an application within that prescribed time period, not a notice that a claim will be forthcoming. The application is to be accordance with Form 13.11a and contain specific information. Petitioner's Notice to the Court, filed on the 58th day after Petitioner contends the factual basis of the claim became available, did not comply with Rule 9.7 and cannot be construed as an application. It neither contained the relevant case information nor any partially developed information about his latest claim. Any application Petitioner could ultimately file in the future in compliance with Rule 9.7(A)(1) and (A)(3) would be

untimely and could not be considered by the Court. The above styled case is **DISMISSED**.

Littlejohn, No. PCD-2005-1155, slip op. at 2-3 (footnotes omitted) (citations omitted).

In his Response, Respondent acknowledges Petitioner's attempt to exhaust, but faults Petitioner for never filing an application. Without addressing the OCCA's application of Rule 9.7(G)(3), Respondent contends only that the issue is unexhausted. In his Reply, Petitioner asserts that exhaustion is futile and that the rule applied by the OCCA to bar the filing of a subsequent post-conviction application is inadequate.

The Court finds that the Tenth Circuit's decision in Anderson v. Sirmons, 476 F.3d 1131 (10th Cir. 2007), is controlling. Addressing similar facts and procedural posturing, the Tenth Circuit found that the claim was exhausted and not procedurally barred. As in the present case, Anderson attempted to present a claim to the OCCA but was prevented from doing so pursuant to Rule 9.7(G)(3). The Court found that any further attempt to exhaust would be futile. Because Anderson had challenged the adequacy of the rule and the State of Oklahoma had not defended it, the Court further found that the rule was inadequate to bar federal habeas review. The Court then proceeded to the merits of the claim, applying *de novo* review. Anderson, 476 F.3d at 1134-42. As in Anderson, this Court finds that Petitioner's Ground Ten is exhausted, that any further attempt to exhaust would be futile, and that Respondent has failed to defend the adequacy of Rule 9.7(G)(3). The Court will therefore review Petitioner's claim *de novo*.

The Supreme Court's holding in <u>Strickland v. Washington</u>, 466 U.S. 668 (1984), governs the disposition of Petitioner's claim. In <u>Strickland</u>, the Supreme Court established a two-prong test to determine ineffective assistance of counsel. A petitioner must show both deficient performance and prejudice. <u>Strickland</u>, 466 U.S. at 687. "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which . . . will often be so, that course should be followed." <u>Id.</u> at 697. When evaluating the prejudicial effect on a death sentence, "the question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." <u>Id.</u> at 695.

> In making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury. Some of the factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways. Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect.

<u>Id.</u> at 695-96. Electing to dispose of Petitioner's ineffectiveness claim on the prejudice prong, the Court finds that even if the jury had been exposed to the findings of Dr. Martin, the verdict would have remained the same.

Dr. Draper, who has a PhD in human development, gave extensive testimony regarding Petitioner's development since conception.[13] She reviewed a multitude of Petitioner's records, including medical records, school records, and incarceration records.

---

[13] Petitioner was 20 years old when the crimes were committed.

She interviewed Petitioner and his family members. From all the information gathered, she prepared a chart of his life path (Defendant's Exhibit 1). Dr. Draper used this chart to illustrate the circumstances of Petitioner's upbringing and their effect on his development.

Regarding Petitioner's birth, Dr. Draper testified that he was a high risk newborn. He had to be hospitalized after delivery for 11 days during which time he received significant treatment. Dr. Draper elaborated that while recent research drew a correlation between a mother's substance abuse and fetal development, at the time of Petitioner's birth, hospitals were unaware (2000 Trial Tr. VI, 89-91). This testimony supported the testimony of Petitioner's mother who testified that she was only 16 years old when she gave birth to Petitioner and that she used drugs during her pregnancy (2000 Trial Tr. VI, 34, 36). Petitioner's mother testified that Petitioner was premature and shook a lot. She stated that Petitioner "had to be ruined from the womb. I mean, I took so much dope till when I delivered, I didn't even know I delivered till the next day. I didn't even know I had a baby" (2000 Trial Tr. VI, 37, 45).

Dr. Draper also testified about the lack of nurturing and attention Petitioner received. In addition to her young age, Petitioner's mother had health problems and continuing drug abuse issues. While Petitioner's paternal grandmother became Petitioner's primary caretaker, she was young herself and was also into drugs, alcohol, and partying, as was her son, Petitioner's father (2000 Trial Tr. VI, 91-92, 98-99). Petitioner's mother had testified to these facts as well. After Petitioner was born, the family lived with Petitioner's paternal grandmother. Petitioner's mother admitted that she had little contact with Petitioner and that

Petitioner's father, who had his own health problems, paid no attention to him at all. With Petitioner under his grandmother's care, she and his father were "[o]ut running around, out visiting, out getting high." The family was on welfare. When Petitioner was four or five years old, Petitioner's mother left the household, leaving Petitioner with his father and grandmother. In addition to her testimony, Petitioner's mother read a letter she had written detailing Petitioner's family life, her regrets, and a plea for mercy for his life (2000 Trial Tr. VI, 38-42, 61-65).

Dr. Draper concluded that Petitioner had attachment problems and that his development stifled around age ten. While Petitioner had average intelligence, he had emotional problems and disruptive behavior. Petitioner understood right from wrong, but did not act on that knowledge (2000 Trial Tr. VI, 101-102, 114, 119-120). Dr. Draper's conclusions found support in the testimony of one of Petitioner's former teachers, who had first contact with Petitioner when he was in the fifth or sixth grade. Through this teacher, who was involved with Petitioner until he was about 15 or 16 years old, the jury was advised that Petitioner was classified by the educational system as severely emotionally disturbed, and that Petitioner had a lot of problems in school, including fighting, cursing, and calling teachers names. At age 14 or 15, Petitioner's emotional outbursts became more difficult to control. Petitioner had difficulty making friends and knowing appropriate boundaries (1994 Trial Tr. VII, 192-94, 196, 199, 201; 2000 Trial Tr. VI, 201).

This is not a case where no mitigation evidence was presented. In fact, it is a case where all of the circumstances of Petitioner's life were explored and detailed to the jury.

Petitioner's life path, with all its disruptions and dysfunctions, was openly displayed. Through an expert witness, family members, a former teacher, and even Petitioner himself,[14] the jury heard evidence which explained how Petitioner, at the young age of 20, ended up robbing a convenience store and facing the death penalty. See Mayes v. Gibson, 210 F.3d 1284, 1288 (10th Cir. 2000) (the purpose of mitigation evidence is to individualize the sentencing proceeding; mitigation evidence gives a capital defendant the opportunity to "humanize and explain" his actions).

Nevertheless, Petitioner asserts that more was necessary, and that had the jury been told of a physical explanation for his actions, they would not have sentenced him to death. The Court disagrees. The jury was readily aware of the extenuating circumstances in Petitioner's life, and from the evidence presented, considered the following mitigating circumstances related thereto:

3. The defendant was born to a drug addicted mother and this had an impact on his development;

4. The defendant's father was an alcoholic who never cared for him or took responsibility raising him;

5. The defendant grew up in a chaotic home due to the presence of alcohol, drugs, gambling and violence;

6. The defendant was abandoned by his mother at the age of five and this abandonment had a profound influence on his development;

---

[14] As discussed in Article IV.F., supra, Petitioner's testimony from his first trial was read at his resentencing proceeding. In that testimony, Petitioner also detailed his upbringing (1994 Trial Tr. VIII, 59-72).

7.    The defendant witnessed the abuse of his mother at the hands of his father;

8.    The defendant was deprived of necessities such as food and utilities as a child; [and]

9.    The defendant was a severely emotionally disturbed student during most of his schooling[.]

(O.R. X, 1887-88).   Thus, while linking these circumstances to a resulting physical impairment may have complemented the evidence presented, trial counsel's failure to do so did not prevent the jury from considering their obvious effect on Petitioner's development. In light of the aggravating circumstances as well, there is no reasonable probability that the jury would have altered its verdict.

The jury found two aggravating circumstances (prior violent felony and continuing threat), both of which are amply supported by the evidence.   As Petitioner himself relayed his criminal history, he learned to hot wire cars at the age of 15 and stole countless cars before being institutionalized in a juvenile facility.   Released at age 18, Petitioner committed a robbery just two weeks later.   Armed with an Uzi, Petitioner shot at his victim several times before hitting him in the head with the Uzi and taking his money. Petitioner also burglarized an automobile, and because he committed these crimes as an adult, he was sent to the penitentiary.   Because of his bad behavior, Petitioner served almost all of his 24-month sentence.   Petitioner was released from the penitentiary in May of 1992.   Within a few weeks, he met up with Bethany, a prison acquaintance, and started selling dope (1994 Trial Tr. VIII,

72-82, 85-86).[15]  He and Bethany robbed the Root-N-Scoot convenience store on June 20, 1992. Considering all this evidence as well, the Court determines that even if the jury had heard the additional mitigating evidence, it would not have had a pervasive effect on the jury's decision.  There is no reasonable probability that the balancing of the aggravating and mitigating evidence would have led the jury to return a sentence other than death. Petitioner's Ground Ten is denied.

**K.     Ground Eleven:     Constitutionality     of     the     Continuing Threat Aggravator.**

In his Ground Eleven, Petitioner challenges the constitutionality of Oklahoma's continuing threat aggravator.  Citing Tuilaepa v. California, 512 U.S. 967 (1994), Petitioner asserts that this aggravator, as construed by the OCCA, is ill defined and too broadly applied.  Petitioner additionally asserts that, due to its unreliability, the aggravator should no longer be used to determine death eligibility. In his second direct appeal, Petitioner argued that the continuing threat aggravator is unconstitutional on its face and as applied.  The OCCA rejected Petitioner's claim.  Littlejohn II, 85 P.3d at 302.

In Tuilaepa, the Supreme Court acknowledged that in order to satisfy the Eighth Amendment, an aggravating circumstance must meet two requirements: (1) it may not apply to every defendant convicted of murder; and (2) it may not be unconstitutionally vague.  Tuilaepa, 512 U.S. at 972.  While Petitioner acknowledges the Tenth Circuit's

_____

[15] The State also presented evidence that on May 31, 1992, Petitioner raped a Tulsa woman (2000 Trial Tr. V, 751-63).

holding in Nguyen v. Reynolds, 131 F.3d 1340, 1352-54 (10th Cir. 1997), wherein the Court concluded that Oklahoma's continuing threat aggravator does not violate these Eighth Amendment requirements, Petitioner contends that it is wrongly decided on both the law and the facts.

In Nguyen, the Tenth Circuit reviewed the constitutionality of Oklahoma's continuing threat aggravator for the first time. Nguyen, 131 F.3d at 1353. With reference to Tuilaepa, the Court acknowledged that a vagueness review must be very deferential. Because aggravating factors cannot be defined with mathematical precision, an aggravating factor is constitutional if a jury is capable of understanding its common-sense meaning. Id. The Court also relied upon the Supreme Court's decision in Jurek v. Texas, 428 U.S. 262 (1976). In Jurek, the Supreme Court, reviewing Texas's future dangerousness aggravator for vagueness, held as follows:

> It is, of course, not easy to predict future behavior. The fact that such a determination is difficult, however, does not mean that it cannot be made. Indeed, prediction of future criminal conduct is an essential element in many of the decisions rendered throughout our criminal justice system. The decision whether to admit a defendant to bail, for instance, must often turn on a judge's prediction of the defendant's future conduct. And any sentencing authority must predict a convicted person's probable future conduct when it engages in the process of determining what punishment to impose. For those sentenced to prison, these same predictions must be made by parole authorities. The task that a Texas jury must perform in answering the statutory question in issue is thus basically no different from the task performed countless times each day throughout the American system of criminal justice.

Jurek, 428 U.S. at 274-76 (footnotes omitted). See also Barefoot v. Estelle, 463 U.S. 880, 896, 906 (1983) (reaffirming Jurek's holding that "the likelihood of a defendant committing

further crimes is a constitutionally acceptable criterion for imposing the death penalty" and finding psychiatric testimony on the issue of future dangerous admissible).

Since Nguyen, decided over a decade ago, the Tenth Circuit has not questioned its holding and determination of the issue, but has consistently held that Oklahoma's continuing threat aggravator is constitutional. Brown, 515 F.3d at 1092; Sallahdin v. Gibson, 275 F.3d 1211, 1232 (10th Cir. 2002); Medlock v. Ward, 200 F.3d 1314, 1319 (10th Cir. 2000); Smith v. Gibson, 197 F.3d 454, 464 (10th Cir. 1999); LaFevers v. Gibson, 182 F.3d 705, 720 (10th Cir. 1999); Ross v. Ward, 165 F.3d 793, 800 (10th Cir. 1999); Castro v. Ward, 138 F.3d 810, 816-17 (10th Cir. 1998). In light of this authority, and the Supreme Court authority upon which it relies, Petitioner's attack on the continuing threat aggravator cannot prevail. Clearly, the decision of the OCCA is not contrary to or an unreasonable application of Tuilaepa, Jurek, and Barefoot.

Petitioner's reference to a 2004 Texas Defender Service study does not change this determination. While Petitioner asserts that the study questions the reliability of predicting future dangerousness, the Court is neither persuaded by the argument nor in any position to overrule prevailing Supreme Court and Tenth Circuit precedent which directly governs disposition of the claim. The Court also finds the argument to be disingenuous given the overwhelming evidence that Petitioner is a continuing threat. As the jury was instructed, the continuing threat aggravator is met when two factors are satisfied: (1) "the defendant's behavior has demonstrated a threat to society"; and (2) "a probability that this threat will continue to exist in the future" (O.R. X, 1880). As the OCCA noted, "a substantial amount"

61

of this evidence was presented. The evidence showed that Petitioner had demonstrated violent behavior since he was a child and that even the imposed limits of incarceration did not subdue it. Littlejohn II, 85 P.3d at 296. In light of this evidence, there is no doubt that the continuing threat aggravator was constitutionally applied to Petitioner. Petitioner's Ground Eleven is denied.

### L.     Ground Twelve:     Denial of Expert for Retrospective Competency Trial.

In his Ground Twelve, Petitioner complains about the state trial court's denial of his request to be personally evaluated by a neurologist, Dr. G. Barry Robbins, in preparation for his retrospective competency hearing. Petitioner additionally asserts that the prosecutor, aware of the trial court's ruling, inappropriately questioned witnesses at the retrospective competency hearing, including Dr. Robbins, and argued in closing argument that Dr. Robbins' testimony should be discounted because he did not ever see Petitioner. Petitioner presented these issues to the OCCA in his first direct appeal. Applying harmless error, the OCCA denied relief. Littlejohn I, 989 P.2d at 905-06.

Petitioner's original competency trial was held in May of 1994. Having been instructed that it was Petitioner's burden to prove his incompetence by clear and convincing evidence, the jury found Petitioner competent (O.R. IV, 685, 735). Following the Supreme Court's decision in Cooper, which was decided while Petitioner's first direct appeal was pending, the OCCA ordered the trial court, if feasible, to conduct a retrospective competency hearing utilizing the preponderance of the evidence standard (O.R. VII, 1339-44). A

retrospective competency hearing was then held in October of 1997. The jury found that Petitioner was competent to stand trial in 1994 (O.R. VIII, 1475-76).

Prior to the October hearing, Petitioner filed a motion requesting that Dr. Robbins be allowed to visit him in the jail. Petitioner also requested that Dr. Robbins be allowed to conduct an EEG. The motion also requested that two other experts, Dr. Allan Eugene Reynolds and Dr. Stephen Carella, be allowed access to Petitioner as well (O.R. VIII, 1443-44). By order dated October 1, 1997, the trial court denied Petitioner's requests with respect to Dr. Robbins (O.R. VIII, 1458).

Although Dr. Robbins was denied access to Petitioner, he did testify at the retrospective competency hearing. Based upon a paper review of Petitioner's history, Dr. Robbins testified that it was his opinion that while Petitioner understood the charges against him, he was unable to assist his attorneys due to neurological impairments (R.C. Trial Tr. II, 9-12, 23).[16] Dr. Robbins believed that Petitioner had some neurological impairment from birth which caused a lack of impulse control. Dr. Robbins testified that Petitioner could stay on topic for only short periods of time and would get aggressive even with those people trying to help him. Petitioner "would not really be compliant with any kind of understanding or comprehension of what was really needed" (R.C. Trial Tr. II, 13). While medicine could help Petitioner's condition, Dr. Robbins testified that Petitioner was not on any such medicine at the time of his trial in 1994 (R.C. Trial Tr. II, 15-17).

---

[16] Dr. Robbins reviewed birth records, hospitalizations, juvenile records, county jail records, family records, DHS investigative reports, and prior psychological evaluations (R.C. Trial Tr. II, 10).

On cross-examination, the prosecutor questioned Dr. Robbins about his contact with Petitioner, emphasizing that Dr. Robbins had never even met him (R.C. Trial Tr. II, 24-25). In response to the prosecutor's later questions, Dr. Robbins acknowledged that it is advantageous to meet with the patient when conducting a neurological diagnosis (R.C. Trial Tr. II, 30-31). Finally, upon concluding cross-examination, the prosecutor directly asked Dr. Robbins, "And there was nothing stopping you from doing some type of competency evaluation of Mr. Littlejohn, was there, sir?" Petitioner objected, but the question was allowed. Dr. Robbins answered, "No, if I had been permitted." Dr. Robbins further testified that he was unaware of any authorization allowing him to meet with Petitioner. At this point, the prosecutor asked to approach the bench and a discussion was had regarding the trial court's order with respect to Dr. Robbins. It is apparent that both the prosecutor and the court were unclear on the court's prior order. The court ordered the prosecutor to move on, but he asked no further questions (R.C. Trial Tr. II, 53-55). On redirect examination, defense counsel sought to clear the matter up.

> Q  (BY MR. MURRY) Were you permitted to conduct an EEG and other neurological evaluation on Mr. Littlejohn?
>
> A  No.
>
> Q  And would you be better prepared to offer your testimony and opinion today if you had been permitted to do that?
>
> A  Yes.

(R.C. Trial Tr. II, 56).

The following day, Dr. Reynolds testified. On direct examination, Dr. Reynolds testified that one of the tests he conducted, the Memory for Designs Test, suggested that Petitioner might have some organic brain damage (R.C. Trial Tr. III, 9-10). Dr. Reynolds further testified that when he readministered this test before the retrospective competency hearing, the result was the same (R.C. Trial Tr. III, 25-26). Dr. Reynolds testified that a referral to a neurologist would determine what organic dysfunction was occurring (R.C. Trial Tr. III, 27-28). On cross-examination, the prosecutor questioned the strength of this evidence. The prosecutor emphasized that since Dr. Reynolds was a psychologist, he could not say for certain that Petitioner had brain damage. The only way to definitively determine the issue was further evaluation by a neurologist, which the prosecutor knew had been denied (R.C. Trial Tr. III, 31-33).

In closing argument as well, the prosecutor, on more than occasion, attacked Dr. Robbins' failure to see Petitioner. The prosecutor argued:

> Well, for $500 a pop for start-up fee, like Dr. Robbins, and for $350 an hour for him to read records and never bother - - if they want to talk about lack of effort - - never bother to go even look and see if Mr. Emmanuel A. Littlejohn is alive or what he's got to say or what he can communicate about the crime itself, let's just read through some records.

(R.C. Trial. Tr. III, 183). And again,

> Now, Dr. Robbins, their neurologist that they called, never saw Emmanuel Littlejohn. And remember what he told you? Dr. Robbins said that if somebody in a family suspected they had some kind of a problem with a family member and they came to Dr. Robbins to alert him, that we've got a concern, the mom is doing this or that or talking to somebody that's not there, what did Dr. Robbins tell you that he would do? He would go and he would investigate. What does that mean, Mr. Robbins? I'd see that family member

and I'd interview them. Well, with respect to Emmanuel A. Littlejohn, then didn't you forget something in this case? I understand that you read records that may have gone back over 20 years, but, you know, that's something that just has to kind of leap out at you in this case.

(R.C. Trial Tr. III, 187-88). And finally,

Now, you heard from one person who did a competency evaluation on Mr. Littlejohn in this case, and that's Dr. King. And Dr. King is somebody who's done now 750 of these competency evaluations. What did Dr. Robbins say? That he['s] done about 25. Well, he didn't do one with Mr. Littlejohn.

(R.C. Trial Tr. III, 193). Surprisingly, especially in light of his earlier objection to the prosecutor's questioning of Dr. Robbins, defense counsel made no objection to these comments.

As noted above, the OCCA denied Petitioner relief on his claims due to harmless error. With respect to Dr. Robbins, the OCCA held that "[w]hile it is unclear why Dr. Robbins was precluded from examining Littlejohn and performing an EEG, we find any error which may have occurred in this regard was harmless beyond a reasonable doubt." Littlejohn I, 989 P.2d at 905. The OCCA's reasoning was as follows:

The jury was charged with determining Littlejohn's competency on or about the 7th day of November, 1994, through the 18th day of November, 1994. Four experts testified at Littlejohn's retrospective competency hearing. Three of these experts had examined Littlejohn during the relevant time frame. Dr. Robbins was the only expert who had not previously examined Littlejohn. In any event, Robbins was able to testify and form an opinion based upon numerous records and documents which had been provided to him. These records included reports prepared by Dr. Edith King, Ph.D. and Dr. Carella. Although Dr. Robbins was the only neurologist to testify, an interview with Littlejohn conducted in 1997 would have been less probative than those conducted near the relevant time period. Moreover, had an EEG ultimately uncovered neurological damage, such damage would not have automatically rendered Littlejohn incompetent to stand trial in 1994.

66

During the retrospective competency hearing, Littlejohn conceded he understood the nature of the charges and proceedings brought against him. Littlejohn's incompetency claim went specifically to his ability to assist his attorneys. Although Littlejohn was a difficult client at times, the evidence overwhelmingly demonstrated he was able to assist counsel in his defense and was competent to stand trial in November of 1994. The most compelling evidence comes from Littlejohn's ability to testify for three and a half hours during his 1994 trial. During this testimony, Littlejohn did not seem "confused or baffled or unfocused in any way." Thus, under the circumstances of this case, actual proof of brain damage would not have altered the jury's verdict. Any error resulting from the trial court's restrictions on Dr. Robbins was harmless beyond a reasonable doubt.

Id. (footnotes omitted) (citation omitted).

Regarding the prosecutor's actions with respect to Dr. Robbins, the OCCA rightly found that the prosecutor's actions were highly inappropriate. The OCCA concluded, however, that the error was harmless. In particular, the OCCA held:

We find it troubling, however, that the State improperly attempted to gain an advantage from Dr. Robbins' inability to visit Littlejohn in the county jail. During cross-examination, the State attempted to impeach Dr. Robbins because he had failed to conduct some type of competency evaluation on Littlejohn. Moreover, during closing arguments, the State again noted Dr. Robbins' failure to interview Littlejohn and conduct tests. This argument was clearly inappropriate. The trial court's October 1, 1997 order plainly denied Dr. Robbins access to Littlejohn in the county jail. Nevertheless, in light of the strong evidence of competency, we find this error was harmless.

Id. at 905-06 (footnote omitted).

Clearly, the OCCA applied Chapman in denying Petitioner relief. Here, however, the governing standard of review is that set forth in Brecht . See Article IV.D., supra. See also Toles v. Gibson, 269 F.3d 1167, 1176-1177 (10th Cir. 2001) (the denial of expert assistance in violation of Ake v. Oklahoma, 470 U.S. 68 (1985), can be harmless error). Thus, the issue

67

is whether the alleged errors "'had [a] substantial and injurious effect or influence in determining the jury's verdict.'" Brecht, 507 U.S. at 631 (citation omitted).

While it is unknown why the trial court denied Dr. Robbins access to Petitioner,[17] Petitioner was not without the assistance of experts at his retrospective competency hearing. In addition to Dr. Robbins, who testified and rendered an opinion about Petitioner's inability to assist his attorneys, Petitioner had two other experts, Dr. Carella and Dr. Reynolds. Both of these experts were psychologists who had previously examined Petitioner in 1993, prior to his original competency hearing, and then again in 1997, before the retrospective competency hearing. Dr. Carella testified for Petitioner at his original competency hearing.[18] Dr. Reynolds was a second stage witness for Petitioner at his original trial. Like Dr. Robbins, both Dr. Carella and Dr. Reynolds reached the same conclusion that while Petitioner understood the charges against him, he could not fully assist his attorneys (O.C. Trial Tr. II, 14-15; R.C. Trial Tr. III, 16-17, 26-27).

Despite this weight of authority, however, Petitioner's actions at the trial confirmed his ability to assist his attorneys. At the retrospective competency hearing, the jury was advised that Petitioner testified for over three and a half hours. A portion of his direct examination testimony was even read to jury. Petitioner did not appear confused or

---

[17] Because the trial court's reasoning is unknown, the propriety of its decision cannot be assessed. Recognizing this, the OCCA found that "any error *which may have* occurred" was harmless. Littlejohn I, 989 P.2d at 905 (emphasis added). Under these circumstances, this Court must also proceed beyond the underlying issue to the issue of harmlessness.

[18] Dr. Carella's prior testimony was introduced in the retrospective competency hearing (R.C. Trial Tr. II, 59-64).

unfocused as he testified, but gave relevant answers to the questions posed by both defense counsel and the prosecution.  In addition to his testimony, Petitioner interacted with his counsel in the examination of witnesses.  Defense counsel would consult with Petitioner to make sure relevant questions were covered and before passing a witness (R.C. Trial Tr. II, 34-35, 41-49; R.C. Trial Tr. III, 116-119, 131-33).

Petitioner's active participation in the trial is the determinative point as well for finding that the prosecutor's actions at the retrospective competency hearing did not have a substantial and injurious effect on the jury's verdict.  Without question, the prosecutor acted inappropriately by making multiple references to Dr. Robbins' failure to meet with Petitioner when he knew or should have known that the trial court had prohibited Dr. Robbins from seeing Petitioner.  However, given the overwhelming evidence that Petitioner was competent, the prosecutor's actions were in fact harmless.

Petitioner's Ground Twelve is denied.

**M.    Ground Thirteen:  Competence to Be Executed.**

In his Ground Thirteen, Petitioner asserts that he is or will be incompetent to be executed.  See Ford v. Wainwright, 477 U.S. 399, 410 (1986) ("the Eighth Amendment prohibits a State from carrying out a sentence of death upon a prisoner who is insane").  Petitioner acknowledges, however, that this claim is not ripe for review. See Stewart v. Martinez-Villareal, 523 U.S. 637, 644-45 (1998) (noting that the habeas petitioner's Ford claim had been dismissed "because his execution was not imminent and therefore his competency to be executed could not be determined at that time"); Herrera v. Collins,

506 U.S. 390, 406 (1993) (a claim that a petitioner is incompetent to be executed "is properly considered in proximity to the execution"). The Court agrees and finds that the claim should be dismissed as premature. If a question of competency exists at the time Petitioner's execution becomes imminent, the matter may be re-urged. See Stewart, 523 U.S. at 645 (subsequent presentation of a ripe Ford claim is not a second or successive petition under 28 U.S.C. § 2244(b)).

**N.     Ground Fourteen: Constitutionality of Oklahoma's Lethal Injection Protocol.**

In his Ground Fourteen, Petitioner alleges that Oklahoma's lethal injection protocol constitutes cruel and unusual punishment under the Eighth Amendment. Petitioner presented this claim to the OCCA on post-conviction. The OCCA denied relief. Littlejohn, No. PCD-2002-551, slip op. at 5-6.

Given the nature of Petitioner's claim, a preliminary question exists as to whether it is cognizable in this action or more properly maintained as a civil rights action pursuant to 42 U.S.C. § 1983. Recent decisions from the Supreme Court, Hill v. McDonough, 547 U.S. 573 (2006), and Nelson v. Campbell, 541 U.S. 637 (2004), have acknowledged that Section 1983 is a viable avenue for litigation of such claims. However, as the Tenth Circuit has recently acknowledged, "[n]either the Supreme Court nor this Circuit has definitively resolved whether claims challenging the specific method of execution may never be considered in a habeas proceeding." Duty v. Workman, No. 07-7073, 2010 WL 533117, at

*11 (10th Cir. Feb. 12, 2010) (unpublished). <u>Duty</u> did not resolve the issue, but denied habeas relief upon application of anticipatory procedural bar to the claim. <u>Id.</u> at *11-12.

In addition to the matter of the proper forum for Petitioner's claim, there is a question as to whether the claim should be deemed procedurally barred. As noted above, Petitioner raised the claim on post-conviction. While the OCCA addressed the claim in the context of a claim of ineffective assistance of appellate counsel, the OCCA ultimately held that "because Littlejohn has not established that appellate counsel's performance was deficient, his substantive claims remain procedurally barred." <u>Littlejohn</u>, No. PCD-2002-551, slip op. at 6. Respondent has argued that a procedural bar should be applied. Petitioner has countered that the bar should not be applied due to inadequacy, as well as ineffective assistance of appellate counsel.

"Where an issue 'may be more easily and succinctly affirmed on the merits,' judicial economy counsels in favor of such a disposition.'" <u>Smith v. Mullin</u>, 379 F.3d 919, 927 (10th Cir. 2004) (citation omitted). Such is the case here. Without deciding the proper forum for Petitioner's claim and the matter of procedural bar, the Court finds that the claim should be denied on the merits.

Petitioner's overriding concern with Oklahoma's lethal injection protocol is the lack of assurance that it will render him unconscious for the duration of the procedure. Petitioner alleges that flaws in the protocol, including the use of untrained personnel, types of drugs used, dosages and sequence of the drugs, and use of two alternating intravenous lines, create an unreasonable risk of a torturous execution. As Petitioner's concerns have been addressed

71

by both Tenth Circuit and Supreme Court authority, the Court finds that his Eighth Amendment claim of cruel and unusual punishment must fail.

In <u>Patton v. Jones</u>, 193 Fed. Appx. 785 (10th Cir. 2006) (unpublished), the Tenth Circuit reviewed a Section 1983 challenge to Oklahoma's lethal injection protocol. Patton's complaints mirrored the allegations now raised by Petitioner. <u>Patton</u>, 193 Fed. Appx. at 787. During the pendency of the case, however, Oklahoma responded to some of the concerns raised and revised its protocol. In particular, it altered the sequence of the drugs, increased the anesthetic dose, and incorporated a two-and-a-half minute delay between injection of the anesthetic and injection of the paralytic agent. <u>Id.</u> at 789. In upholding the district court's determination that Patton had failed to establish a significant possibility of success on the merits of his Eighth Amendment claims, especially given the revised protocol, the Court agreed with the district court's conclusion "that the critical question . . . 'is not what is optimally desirable,' as, for example, in a surgical setting, but rather 'what is minimally required' to avoid a violation of the Eighth Amendment." <u>Id.</u> at 790 (citation omitted).

In <u>Hamilton v. Jones</u>, 472 F.3d 814 (10th Cir. 2007), the Tenth Circuit addressed another challenge to Oklahoma's lethal injection protocol and once again found that the objections raised fell short of making a successful Eighth Amendment claim. The Court detailed the post-<u>Patton</u> protocol as follows:

> Oklahoma's lethal-injection protocol provides in pertinent part that (1) bilateral intravenous fluid drips ("IVs") will be established in the veins of the inmate's arms by "an EMT-P or person with similar qualifications and expertise in IV insertion," (2) the EMT-P "will ensure the patency [of the IV] until the time of execution by slow infusion of normal saline or dextrose,"

(3) the drugs are then introduced bilaterally, starting with 1200 mg doses of sodium thiopental, an ultra- fast-acting barbituate, to anesthetize the inmate and render him unconscious, followed two and one-half minutes later by 20 mg doses of vecuronium bromide to induce paralysis, and then 100 mg doses of potassium chloride to stop the heart and cause death; and (4) if only one IV can be established and confirmed as patent, both doses of each drug are administered serially through that IV.

Hamilton, 472 F.3d at 816 (footnote omitted).  While noting that the primary criticism of the procedure is the lack of monitoring to ensure effective anesthetization, the Court agreed with the district court that the precautions in place were sufficient and "that the risk of failure that this kind of monitoring would address was simply far too remote to rise to a constitutional level so as to require that it be done in connection with executions."  Id. at 817.

Thus, while monitoring of anesthetization level is the optimal practice appropriate for a surgical operating room (where, significantly, lower doses of anesthetic are used in order to minimize post-surgical "emergence" complications that have no counterpart in the execution setting), the risk inherent in the lethal-injection procedure under review is already so attenuated that we cannot say there is a significant likelihood that a challenge to the protocol under the minimal requirements imposed by the Eighth Amendment on executions could succeed on our record.

Id.  The Court also found that Oklahoma's use of an EMT-P to establish and confirm the patency of the IV was acceptable, as EMT-P's are expressly recognized professionals qualified for this purpose.  Id.

In addition to Patton and Hamilton, the Supreme Court's decision in Baze v. Rees, 553 U.S. 35 (2008) (plurality opinion), weighs against Petitioner.  In Baze, the Supreme Court upheld Kentucky's lethal injection protocol against an Eighth Amendment challenge. Baze, 553 U.S. at 47.  Kentucky, like Oklahoma, 28 other states, and the federal government,

uses a similar combination of three drugs in their lethal injection protocols. <u>Id.</u> at 44, 53. As noted by the Court, "[t]he proper administration of the first drug ensures that the prisoner does not experience any pain associated with the paralysis and cardiac arrest caused by the second and third drugs." <u>Id.</u> at 44.

As in <u>Patton</u> and <u>Hamilton</u>, the Court in <u>Baze</u> addressed concerns like those raised by Petitioner. <u>Id.</u> at 54-59. In concluding that these concerns did not rise to the level of cruel and unusual punishment, the Court noted that "[s]ome risk of pain is inherent in any method of execution - no matter how humane - if only from the prospect of error in following the required procedure. It is clear, then, that the Constitution does not demand the avoidance of all risk of pain in carrying out executions." <u>Id.</u> at 47. "Simply because an execution method may result in pain, either by accident or as an inescapable consequence of death, does not establish the sort of 'objectively intolerable risk of harm' that qualifies as cruel and unusual." <u>Id.</u> at 50. The Court concluded that:

> Kentucky has adopted a method of execution believed to be the most humane available, one it shares with 35 other States. Petitioners agree that, if administered as intended, that procedure will result in a painless death. The risks of maladministration they have suggested - such as improper mixing of chemicals and improper setting of IVs by trained and experienced personnel - cannot remotely be characterized as "objectively intolerable." Kentucky's decision to adhere to its protocol despite these asserted risks, while adopting safeguards to protect against them, cannot be viewed as probative of the wanton infliction of pain under the Eighth Amendment.

<u>Id.</u> at 62.

In light of <u>Patton</u>, <u>Hamilton</u>, and <u>Baze</u>, the Court finds that Petitioner's challenge to Oklahoma's lethal injection protocol is without merit.  Petitioner's Ground Fourteen is therefore denied.

### V.  Conclusion.

After a thorough review of the entire state court record, the pleadings filed herein, and the applicable law, the Court finds that Petitioner is not entitled to his requested relief. Accordingly, Petitioner's Petition (Doc. 13) is hereby **DENIED**.  A judgment will enter accordingly.

IT IS SO ORDERED this 27th day of May, 2010.

VICKI MILES-LaGRANGE
CHIEF UNITED STATES DISTRICT JUDGE