IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF OKLAHOMA

EMMANUEL LITTLEJOHN,      )
                            )
       Petitioner,         )
                            )
vs.                       )     Case No. CIV-05-225-M
                            )
ANITA TRAMMELL, Warden,   )
   Oklahoma State Penitentiary,  )
                            )
       Respondent.       )

## **MEMORANDUM OPINION**

In <u>Littlejohn v. Trammell</u>, 704 F.3d 817 (10th Cir. 2013), this Court was directed to hold an evidentiary hearing on Petitioner's claim that his trial counsel rendered constitutionally ineffective assistance in his 2000 resentencing proceeding.[1] The purpose of the hearing was to allow further development of Petitioner's claim that his trial counsel, James Rowan, was ineffective for failing to investigate and present evidence of his organic brain dysfunction. The evidentiary hearing was held February 25-26, 2014, and supplemental briefing was concluded on May 12, 2014. Having afforded Petitioner the opportunity to fully develop this claim and reviewing the claim de novo,[2] the Court remains convinced that Petitioner has failed to demonstrate his entitlement to relief. In fact, beyond the Court's

---

[1] The scope of the remand includes not only the ineffectiveness claim alleged in Petitioner's Ground Ten, but also Petitioner's cumulative error claim presented in Ground Nine. <u>Littlejohn</u>, 704 F.3d at 822, 868-69.

[2] The Court applied de novo review in its initial disposition of the claim, and the Tenth Circuit agreed that de novo review is appropriate. <u>Littlejohn</u>, 704 F.3d at 854-56.

original determination that Petitioner was not prejudiced by his trial counsel's actions (which finds additional support in the newly developed facts), the Court finds that the additional evidence received demonstrates that Petitioner was represented by an exceedingly competent attorney who made a reasonable strategic decision in the investigation and presentation of Petitioner's mitigation case.

## Petitioner's Ineffectiveness Claim

Petitioner asserts that Mr. Rowan was ineffective for relying on Dr. Wanda Draper, a developmental epistemologist with a PhD in human development, as his sole mitigation expert. Although Dr. Draper provided extensive testimony regarding the circumstances of Petitioner's upbringing and their effect on his development, Petitioner argues that her testimony could have been perceived as "psycho-babble," and that it was, in any event, incomplete. Relying on a September 16, 2005, examination by Dr. Manuel Saint Martin, a psychiatrist, Petitioner asserts that there is evidence of a physical impairment to his brain that Mr. Rowan should have discovered and presented to the jury. Petitioner contends that with this additional evidence, there is a reasonable probability that the jury would not have sentenced him to death. Petition, pp. 105-112.

In support of his claim, Petitioner provided the Court with a declaration from Dr. Saint Martin dated September 26, 2005. Petition, Attachment A. In the declaration, Dr. Saint Martin states that Petitioner has "indications of neuro-development deficits" which may be the result of being born to a mother who was a drug and alcohol abuser and being raised in

an environment in which he was deprived and neglected.  Dr. Saint Martin further states as

follows:

> 5. It has long been known that the brain develops in stages, beginning pre-nataly, and continuing until about age eighteen, and that insults to the brain through in utero drug and alcohol abuse can negatively impact neurological development. More recent studies correlate physical and emotional neglect in a child's early years with impaired development of the brain. These insights into neuro-development were available before the time of Mr. Littlejohn's resentencing in 2000. In layman's terms, impaired neuro-development would mean the brain is not "wired" correctly.  This normally would be expected to occur at the level of synapse which is the microscopic connections between individual brain cells.  While the specifics of these "wiring" problems are not yet well understood, studies demonstrate the correlations are there.

> . . . .

> 7. My evaluation of Mr. Littlejohn is consistent with him suffering a behavioral disorder manifested by poor impulse control, psychological immaturity and judgment that is caused by neuro-developmental deficits experienced in his peri-natal development.  That is to say the evaluation is consistent with neurological deficits caused by insults to Mr. Littlejohn's developing brain through his mother's drug abuse pre-nataly and through neglect post-nataly.

Attachment A, pp. 1-2.

### Prior Disposition of Petitioner's Ineffectiveness Claim

Addressing Petitioner's claim de novo, this Court previously found that Petitioner was

not entitled to relief because he had failed to demonstrate prejudice, one of the two

requirements mandated by <u>Strickland v. Washington</u>, 466 U.S. 668 (1984), to obtain relief

for a claim of ineffective assistance of counsel.  <u>Littlejohn v. Workman</u>, No. CIV-05-225-M,

2010 WL 2218230, at *26-30 (W.D. Okla. May 27, 2010) (unpublished).  In particular, the

Court held:

> Dr. Draper, who has a PhD in human development, gave extensive testimony regarding Petitioner's development since conception.[FN13] She reviewed a multitude of Petitioner's records, including medical records, school records, and incarceration records. She interviewed Petitioner and his family members. From all the information gathered, she prepared a chart of his life path (Defendant's Exhibit 1). Dr. Draper used this chart to illustrate the circumstances of Petitioner's upbringing and their effect on his development.

> [FN13] Petitioner was 20 years old when the crimes were committed.

> Regarding Petitioner's birth, Dr. Draper testified that he was a high risk newborn. He had to be hospitalized after delivery for 11 days during which time he received significant treatment. Dr. Draper elaborated that while recent research drew a correlation between a mother's substance abuse and fetal development, at the time of Petitioner's birth, hospitals were unaware (2000 Trial Tr. VI, 89–91). This testimony supported the testimony of Petitioner's mother who testified that she was only 16 years old when she gave birth to Petitioner and that she used drugs during her pregnancy (2000 Trial Tr. VI, 34, 36). Petitioner's mother testified that Petitioner was premature and shook a lot. She stated that Petitioner "had to be ruined from the womb. I mean, I took so much dope till when I delivered, I didn't even know I delivered till the next day. I didn't even know I had a baby" (2000 Trial Tr. VI, 37, 45).

> Dr. Draper also testified about the lack of nurturing and attention Petitioner received. In addition to her young age, Petitioner's mother had health problems and continuing drug abuse issues. While Petitioner's paternal grandmother became Petitioner's primary caretaker, she was young herself and was also into drugs, alcohol, and partying, as was her son, Petitioner's father (2000 Trial Tr. VI, 91–92, 98–99). Petitioner's mother had testified to these facts as well. After Petitioner was born, the family lived with Petitioner's paternal grandmother. Petitioner's mother admitted that she had little contact with Petitioner and that Petitioner's father, who had his own health problems, paid no attention to him at all. With Petitioner under his grandmother's care, she and his father were "[o]ut running around, out visiting, out getting high." The family was on welfare. When Petitioner was four or five years old, Petitioner's mother left the household, leaving Petitioner with his father and

grandmother. In addition to her testimony, Petitioner's mother read a letter she had written detailing Petitioner's family life, her regrets, and a plea for mercy for his life (2000 Trial Tr. VI, 38–42, 61–65).

Dr. Draper concluded that Petitioner had attachment problems and that his development stifled around age ten. While Petitioner had average intelligence, he had emotional problems and disruptive behavior. Petitioner understood right from wrong, but did not act on that knowledge (2000 Trial Tr. VI, 101–102, 114, 119–120). Dr. Draper's conclusions found support in the testimony of one of Petitioner's former teachers, who had first contact with Petitioner when he was in the fifth or sixth grade. Through this teacher, who was involved with Petitioner until he was about 15 or 16 years old, the jury was advised that Petitioner was classified by the educational system as severely emotionally disturbed, and that Petitioner had a lot of problems in school, including fighting, cursing, and calling teachers names. At age 14 or 15, Petitioner's emotional outbursts became more difficult to control. Petitioner had difficulty making friends and knowing appropriate boundaries (1994 Trial Tr. VII, 192–94, 196, 199, 201; 2000 Trial Tr. VI, 201).

This is not a case where no mitigation evidence was presented. In fact, it is a case where all of the circumstances of Petitioner's life were explored and detailed to the jury. Petitioner's life path, with all its disruptions and dysfunctions, was openly displayed. Through an expert witness, family members, a former teacher, and even Petitioner himself, [FN14] the jury heard evidence which explained how Petitioner, at the young age of 20, ended up robbing a convenience store and facing the death penalty. See Mayes v. Gibson, 210 F.3d 1284, 1288 (10th Cir. 2000) (the purpose of mitigation evidence is to individualize the sentencing proceeding; mitigation evidence gives a capital defendant the opportunity to "humanize and explain" his actions).

> [FN14] As discussed in Article IV.F., supra, Petitioner's testimony from his first trial was read at his resentencing proceeding. In that testimony, Petitioner also detailed his upbringing (1994 Trial Tr. VIII, 59–72).

Nevertheless, Petitioner asserts that more was necessary, and that had the jury been told of a physical explanation for his actions, they would not have sentenced him to death. The Court disagrees. The jury was readily aware

of the extenuating circumstances in Petitioner's life, and from the evidence presented, considered the following mitigating circumstances related thereto:

> 3.     The defendant was born to a drug addicted mother and this had an impact on his development;

> 4.     The defendant's father was an alcoholic who never cared for him or took responsibility raising him;

> 5.     The defendant grew up in a chaotic home due to the presence of alcohol, drugs, gambling and violence;

> 6.     The defendant was abandoned by his mother at the age of five and this abandonment had a profound influence on his development;

> 7.     The defendant witnessed the abuse of his mother at the hands of his father;

> 8.     The defendant was deprived of necessities such as food and utilities as a child; [and]

> 9.     The defendant was a severely emotionally disturbed student during most of his schooling[.]

(O.R. X, 1887–88). Thus, while linking these circumstances to a resulting physical impairment may have complemented the evidence presented, trial counsel's failure to do so did not prevent the jury from considering their obvious effect on Petitioner's development. In light of the aggravating circumstances as well, there is no reasonable probability that the jury would have altered its verdict.

The jury found two aggravating circumstances (prior violent felony and continuing threat), both of which are amply supported by the evidence. As Petitioner himself relayed his criminal history, he learned to hot wire cars at the age of 15 and stole countless cars before being institutionalized in a juvenile facility. Released at age 18, Petitioner committed a robbery just two weeks later. Armed with an Uzi, Petitioner shot at his victim several times before hitting him in the head with the Uzi and taking his money. Petitioner also burglarized an automobile, and because he committed these crimes as an

adult, he was sent to the penitentiary. Because of his bad behavior, Petitioner served almost all of his 24–month sentence. Petitioner was released from the penitentiary in May of 1992. Within a few weeks, he met up with Bethany, a prison acquaintance, and started selling dope (1994 Trial Tr. VIII, 72–82, 85–86).[FN15] He and Bethany robbed the Root–N–Scoot convenience store on June 20, 1992. Considering all this evidence as well, the Court determines that even if the jury had heard the additional mitigating evidence, it would not have had a pervasive effect on the jury's decision. There is no reasonable probability that the balancing of the aggravating and mitigating evidence would have led the jury to return a sentence other than death. Petitioner's Ground Ten is denied.

> [FN15] The State also presented evidence that on May 31, 1992, Petitioner raped a Tulsa woman (2000 Trial Tr. V, 751–63).

Id. at *28-30.

### Tenth Circuit's Ruling on Petitioner's Ineffectiveness Claim

On appeal, the Tenth Circuit was "constrained to disagree with" this Court's determination in light of the existing record, and it remanded the case "for further development of the factual record." Littlejohn, 704 F.3d at 854, 856. In its assessment of the existing record, the Tenth Circuit credited Dr. Saint Martin with "uncover[ing] evidence of a potential organic brain disorder," and it characterized Petitioner's claim as one challenging Mr. Rowan's "fail[ure] to connect the dots between [Petitioner's] childhood developmental problems and the fact that he suffers from demonstrated, physiological brain damage, which *Dr. Saint Martin discovered*." Id. (emphasis added). From this framework, the Tenth Circuit concluded that Petitioner's "ineffective-assistance claim *may* have merit." Id. at 856 (emphasis added).

Analyzing Petitioner's claim under <u>Strickland</u>, the Tenth Circuit found that "*if* the facts validate Mr. Littlejohn's averments,"

> there is a very real likelihood that the decision of Mr. Littlejohn's counsel to focus *solely* on mitigating evidence relating to the socioeconomic conditions of Mr. Littlejohn's upbringing and to his psychological makeup–without even investigating whether there was some physical, brain-related condition that would account for Mr. Littlejohn's behavior–amounted to constitutionally deficient performance."

<u>Id.</u> at 861, 863. Here, the Circuit noted the presence of "numerous indicators" and "patent 'red flags'" which should have alerted Mr. Rowan to seek a neurological evaluation. <u>Id.</u> at 862, 863. Regarding prejudice, the Circuit acknowledged the power of organic brain damage in a mitigation case and it noted that such evidence "probably would have been a significant favorable input for Mr. Littlejohn in the jury's decisionmaking calculus." <u>Id.</u> at 864. The Circuit additionally noted that if Petitioner's mental deficiencies were treatable with medication as Dr. Saint Martin indicated in his declaration, then this would have "strongly militated against a conclusion that . . . Mr. Littlejohn was actually a continuing threat." <u>Id.</u> at 865.

**Evidentiary Hearing**

At the evidentiary hearing, Petitioner presented four witnesses: (1) Dr. Stephen Carella, the psychologist who conducted a neuropsychological evaluation of Petitioner in 1993; (2) Mr. Rowan, Petitioner's trial counsel; (3) Dr. Saint Martin, the psychiatrist whose 2005 declaration was the reason Petitioner received an evidentiary hearing; and (4) Dr. Drew Nagele, a neuropsychologist, who evaluated Petitioner in May 2013 in preparation for the

evidentiary hearing. Respondent presented three witnesses: (1) Jessica Smith, an Oklahoma Department of Corrections employee and Petitioner's case manager; (2) Pattye High, a former assistant district attorney who represented the State in the proceedings against Petitioner; and (3) Dr. William Ruwe, a clinical neuropsychologist.

At the evidentiary hearing, Dr. Saint Martin reaffirmed the statements made in his declaration; however, for the purpose of the evidentiary hearing, he provided a more detailed report (E.H. Tr. 93; Joint Exhibit 2). In this report dated October 21, 2013, Dr. Saint Martin expounds upon the examination and testing of Petitioner in September 2005, and he states for the first time the three specific mental deficits he believes plague Petitioner: (1) attention deficit disorder ("ADD"); (2) impulse control disorder; and (3) mixed dramatic personality traits (E.H. Tr. 91; Joint Exhibit 2, p. 7). However, Dr. Saint Martin testified that "[t]he two conditions that had the most bearing on [Petitioner's] brain function were the [ADD] and the impulse control disorder" and that these conditions "were basically dysfunctions in Mr. Littlejohn's frontal lobes" (E.H. Tr. 91, 94). In defending his diagnoses, Dr. Saint Martin testified that Petitioner's history was replete with references to ADD and impulsivity.

> All of the other clinicians, from the time Mr. Littlejohn was in grade school, up until the time of his first trial, they all concluded that there were problems with frustration, there were problems with impulse control, there was attention deficit disorder. They all commented on problems that he had in the

home, problems with his birth, and they all found that these
were significant, including myself.

(E.H. Tr. 98). Dr. Saint Martin acknowledged that he did not do any neurological testing of

Petitioner, but relied on the neurological testing conducted by others, including

Dr. Carella (E.H. Tr. 103, 111).

Relative to the statements made in his declaration, Dr. Saint Martin testified that

Petitioner's brain dysfunctions were due to "prenatal and perinatal insults" (E.H. Tr. 94).

Dr. Saint Martin additionally testified that these dysfunctions cause Petitioner to have "low

frustration tolerance" and "a lot of problems with impulses because he cannot inhibit those

behaviors" (E.H. Tr. 94-95).  Regarding treatment options, Dr. Saint Martin testified that

there is an 80% response rate to medication given for ADD and only a 40% response rate to

medication given for impulse control disorder (E.H. Tr. 96-97).  Dr. Saint Martin

acknowledged that Petitioner had not been given the medicines he would recommend for

either disorder, and it was therefore not known what effect, if any, they would have on

him (E.H. Tr. 154).

Dr. Carella testified at the evidentiary hearing regarding his evaluation of Petitioner

on June 4, 1993, and subsequent report dated May 2, 1994 (E.H. Tr. 9; Petitioner's

Exhibit 8).  Dr. Carella was hired by the defense to do a neuropsychological evaluation of

Petitioner.[3]  Although Dr. Carella found "no significant impairment" in Petitioner's "gross

---

[3] Dr. Carella was hired after Sally Church, a licensed professional counselor, evaluated
Petitioner and recommended that Petitioner undergo neuropsychological testing (Joint Exhibits 11
and 20; Respondent's Exhibits 17 and 18).

neuropsychological functioning," he did find "very specific deficits . . . in attention and concentration" which led to a diagnosis of ADD. Dr. Carella suggested that Petitioner could benefit from medication like Ritalin (E.H. Tr. 10-12, 13; Petitioner's Exhibit 8, pp. 1, 3-4).

Mr. Rowan represented Petitioner in his 1994 trial and his 2000 resentencing (E.H. Tr. 17, 20). Mr. Rowan is a successful, experienced capital defense attorney. Of the forty-two capital cases Mr. Rowan has tried, only eight have resulted in a death sentence. With his vast experience, Mr. Rowan admitted that he was well aware of the value of mental health testimony in a mitigation case. He routinely has his clients evaluated by mental health experts, and he has previously presented evidence of organic brain damage. Regarding Dr. Saint Martin's report, Mr. Rowan testified that Dr. Saint Martin could have provided beneficial information to Petitioner's jury, and that he did not make a tactical decision not to pursue the evidence Dr. Saint Martin could have provided. Mr. Rowan testified that his decision was based on budgetary concerns, that he "decided not to fight the battle for the mental health experts [he] needed," and that he made "a profound mistake" for which he is "profoundly sorry" (E.H. Tr. 21-31).

When Mr. Rowan replaced Petitioner's original appointed counsel, Melody Brannon, before the 1994 trial, he was aware that Ms. Brannon had consulted with several mental health experts, including Ms. Church, Dr. Carella, and Dr. Eugene Reynolds. Regarding Petitioner's mental health, Mr. Rowan testified as follows:

> Well, there was no one that was not aware that he had attention deficit disorder problems, impulsivity problems, and he had a rich history of

> misconducts, going back to his school years, his juvenile history, trip to Rader, crimes, and so there was something wrong with him. I mean, that was the first impression I had was that there was certainly something wrong with him mentally and there was enough indication there that he had mental problems.

(E.H. Tr. 20). With respect to Dr. Carella specifically, Mr. Rowan testified that he was familiar with Dr. Carella's report that Petitioner had "some brain disorders," including ADD which could be treated with Ritalin. However, Mr. Rowan testified that he did not ever discuss the report with Dr. Carella (E.H. Tr. 20-21).

Despite his testimony that he made a mistake by not pursuing the mental health evidence Dr. Saint Martin could have provided, Mr. Rowan acknowledged that "organic brain damage is the brass ring," that Petitioner had been screened for organic brain damage by Ms. Church, Dr. Carella, and Dr. Reynolds, that the defense strategy in Petitioner's case was "pushing hard to find organic brain injury" because it "held the key to Mr. Littlejohn's behavior," and that ADD could be an organic brain injury (E.H. Tr. 34, 38, 43, 55-57).[4] Mr. Rowan admitted that he choose to present Dr. Reynolds in the 1994 trial (instead of

---

[4] In support of Ms. Brannon's request for Ms. Church to conduct psychological and neurological testing, she advised, among other things, that Petitioner "has a history of impulsive behavior" and that "it is evident that [he] has some type of functional or organic disability" (Respondent's Exhibit 17). In support of Ms. Brannon's request for Dr. Carella to conduct neuropsychological testing, she stated, "This defendant was recently administered a battery of psychological tests, the results of which indicated possible organic brain damage," and "A full battery of neuropsychological tests is necessary to determine the extent and severity of any organic brain dysfunction or damage" (Respondent's Exhibit 18). In addition to Ms. Church and Dr. Carella, Ms. Brannon requested the services of Dr. Reynolds due to Petitioner's "suspected brain damage" (Respondent's Exhibit 19). All of these documents were contained within Mr. Rowan's files (E.H. Tr. 38-43).

Dr. Carella or Ms. Church),[5] and he acknowledged that through Dr. Reynolds, he was able to present evidence that Petitioner has mental issues over which he has no control (E.H. Tr. 35-37).[6] Although unsuccessful, and in hindsight "not to the quality of Dr. Saint Martin," Mr. Rowan acknowledged that his strategy in the second stage of the 1994 trial was to show that Petitioner had organic brain damage which would explain his actions (E.H. Tr. 51).

For Petitioner's resentencing, Mr. Rowan considered calling Dr. Carella and/or Dr. Reynolds, but choose not to, even though he admitted that this evidence would have "fit" with Dr. Draper's testimony. Instead, he changed his strategy and presented only

---

[5] In his request for additional funds to permit Dr. Reynolds to testify at Petitioner's 1994 trial, Mr. Rowan stated that he did not plan to call either Dr. Carella or Ms. Church, but only Dr. Reynolds, who he asserted was "essential to the defense presentation." Mr. Rowan additionally stated as follows:

> [Dr. Reynolds] can explain with authority that drugs and alcohol have a bad effect on children. [I]ntroducing a child to drugs and alcohol prior to its birth has the long-term effect of causing Emmanuel attention deficit disorder and hyperactivity. The parts of Emmanuel's brain that control his judgment have been impaired. He is less responsible than a normal person who commits murder and therefore is less deserving of the death penalty.

(Respondent's Exhibit 31). At the evidentiary hearing, Mr. Rowan stood by his decision to present Dr. Reynolds in Petitioner's first trial: "I think that for as much knowledge as Dr. Reynolds had, I think it was important for the jury to hear him as a witness, otherwise I would not have put him on the stand" (E.H. Tr. 37).

[6] Dr. Reynolds, a clinical psychologist, testified that Petitioner "is a seriously emotionally disturbed individual who . . . may be diagnosed as experiencing a schizophrenic process with auditory and visual hallucinations." Dr. Reynolds described Petitioner as "very impulsive," and he testified that as an emotionally disturbed individual, Petitioner does not have control over his behavior. Dr. Reynolds explained that Petitioner's problems were result of his life history, including difficulties at birth and abandonment by his mother. When asked if Petitioner had organic brain damage, Dr. Reynolds acknowledged that "there is evidence that Mr. Littlejohn does have neurological impairments" (1994 Tr. VII, 228-37).

Dr. Draper (E.H. Tr. 43-45, 52, 59-60).[7]  Mr. Rowan testified regarding his "great faith" in Dr. Draper and his "very healthy respect for a development history that [she] could provide" (E.H. Tr. 34, 43).  Mr. Rowan explained further that "because in Emmanuel Littlejohn's horrific childhood, [he] thought that there could be a story there that would touch the jury and certainly help explain why he behaved the way he did" (E.H. Tr. 43).  Despite Mr. Rowan's testimony that restrictive budgeting led to his decision not to pursue additional expert funds to seek out Dr. Saint Martin or another psychiatrist who could have provided similar testimony, Mr. Rowan made three separate funding requests in the aggregate amount of $13,000.00 to compensate Dr. Draper for her services (E.H. Tr. 58; Respondent's Exhibits 33, 36, and 37).

Additional facts developed at the evidentiary hearing will be referenced herein as relevant to the disposition of Petitioner's remanded claims.

## Analysis

The question in this case is whether Petitioner's trial counsel, a seasoned capital litigator who "like[s] winning"[8] and who has kept thirty-four defendants off death row, uncharacteristically dropped the ball and failed to follow the "patent red flags" that pointed

---

[7] In a March 30, 1999 letter to Petitioner's grandmother, defense investigator Karen Billing advised her that Petitioner had received a new sentencing proceeding and that "[t]he attorneys are planning a somewhat different approach and will need to get together with you and the other witnesses in the near future.  We are contracting with different experts, some of whom will also want to talk to you" (E.H. Tr. 41; Respondent's Exhibit 34).

[8] E.H. Tr. 40.

to organic brain damage which Petitioner subsequently "discovered" through Dr. Saint Martin. The answer is no, because while Dr. Saint Martin's declaration appeared to suggest that he had found something that Mr. Rowan had missed, the expanded record reveals that Dr. Saint Martin's diagnoses were well-known to Mr. Rowan, that Mr. Rowan made a reasonable, strategic decision not to present them in Petitioner's resentencing proceeding, and that Petitioner was not prejudiced by Mr. Rowan's failure to present this evidence.

To obtain relief, Petitioner must first demonstrate that Mr. Rowan's representation was deficient. Strickland, 466 U.S. at 687. Petitioner must show that Mr. Rowan "made errors so serious that [he] was not functioning as the 'counsel' guaranteed [Petitioner] by the Sixth Amendment." Id. The assessment of Mr. Rowan's conduct is "highly deferential," and Petitioner must overcome the strong presumption that Mr. Rowan's actions constituted sound trial strategy. Id. at 689. "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable. . . ." Id. at 690.

As Strickland cautions, "[i]t is all too tempting for a [petitioner] to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." Id. at 689. Therefore, "[a] fair assessment of [Mr. Rowan's] performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of [his] challenged conduct, and to evaluate the conduct from [his] perspective at the time." Id. at 689. Within "the wide range

of reasonable professional assistance," "[t]here are countless ways to provide effective assistance in any given case[, and] [e]ven the best criminal defense attorneys would not defend a particular client in the same way." Id. at 690.

Although Mr. Rowan has been impugned for not discovering what Dr. Saint Martin found, the record reflects that what Dr. Saint Martin found was just more of what Mr. Rowan already knew. Mr. Rowan was well-aware of Petitioner's ADD and impulsivity, and in fact, he admitted "there was no one that was not aware" of these problems (E.H. Tr. 20). Because Petitioner's mental difficulties were so readily apparent, they were a focus of Petitioner's defense team, and by the time Mr. Rowan took over as lead counsel for Ms. Brannon,[9] Petitioner had already been evaluated by three mental health experts. And, as even Dr. Saint Martin acknowledged, these experts did not miss the mark but were spot on and in agreement with what he found as well: "All of the other clinicians . . . concluded that there were problems with frustration, there were problems with impulse control, there was attention deficit disorder. They all commented on problems that he had in the home, problems with his birth, and they all found that these were significant, including myself" (E.H. Tr. 98).

Having represented Petitioner in his first trial, Mr. Rowan also had the benefit of a second chance. In the 1994 trial, Mr. Rowan presented mental health testimony through Dr. Reynolds, and at the evidentiary hearing, Mr. Rowan testified as follows:

_____

[9] The record reflects that Mr. Rowan became lead counsel in late August/early September 1994 (O.R. V, 951).

16

> Q.     You put on Dr. Reynolds.  Dr. Reynolds testified that he thought there might be organic brain injury?
>
> A.     Right.
>
> Q.     That was in front of the jury?
>
> A.     Right.
>
> Q.     So in that case, you were able to argue that Mr. Littlejohn has mental issues that he had no control over?
>
> A.     I was able to do that, yes.
>
> Q.     What was the outcome of that trial?
>
> A.     Mr. Littlejohn got the death penalty.

(E.H. Tr. 36).  Although the jury's sentencing decision in Petitioner's first trial may have been influenced by other factors as well, the fact that Petitioner received a death sentence even though Mr. Rowan presented evidence that Petitioner is "a seriously emotionally disturbed individual," who was also "very impulsive" and did not "choose to be the way he is," cannot be discounted as a strategic reason why Mr. Rowan took a different approach in Petitioner's resentencing proceeding (1994 Tr. VII, 232, 234, 235).  And, the record supports a finding that the change in strategy was an intentional one.  As a member of the defense team wrote to Petitioner's grandmother after Petitioner was granted a new penalty phase: "The attorneys are planning a somewhat different approach and will need to get together with you and the other witnesses in the near future.  We are contracting with different experts, some of whom will also want to talk to you" (Respondent's Exhibit 34).

So it is clear that Mr. Rowan knew of Petitioner's mental failings and that he intentionally altered the mitigation case for Petitioner's resentencing proceeding. Nevertheless, the question remains – was it reasonable? Should Mr. Rowan have sought out a psychiatrist like Dr. Saint Martin, a more "enlightened" expert as he is described by Petitioner? Did Mr. Rowan cut off the mental health investigation too early, or did he know enough to make a reasonable decision to proceed without further investigation? Without venturing into the prohibited considerations of hindsight and Mr. Rowan's subjective evidentiary hearing testimony in which he assumed full responsibility for the unfavorable outcome Petitioner received, the Court cannot conclude that Mr. Rowan acted deficiently.

Mr. Rowan is a committed professional who undoubtedly and wholeheartedly believes that if his client receives the death penalty, it is because he did not do enough. While the Court does not doubt Mr. Rowan's sincerity, the Court finds that his testimony was tainted by the high standards he sets for himself and the regret he feels if he is unable to spare his client from a death sentence. This is not uncommon for the dedicated defender.

> After an adverse verdict at trial even the most experienced counsel may find it difficult to resist asking whether a different strategy might have been better, and, in the course of that reflection, to magnify their own responsibility for an unfavorable outcome. Strickland, however, calls for an inquiry into the objective reasonableness of counsel's performance, not counsel's subjective state of mind.

Harrington v. Richter, 562 U.S. ___, 131 S. Ct. 770, 790 (2011). When the developed facts are viewed objectively, Mr. Rowan's testimonial assertions do not hold up.

Mr. Rowan testified at the evidentiary hearing that Petitioner's defense could have benefitted from Dr. Saint Martin in two ways. First, Dr. Martin could have alleviated Mr. Rowan's fear that Petitioner had antisocial personality disorder (E.H. Tr. 23, 30, 73). However, the issue of whether or not Petitioner had this stigmatizing disorder is not black and white. Although Dr. Saint Martin did not diagnose Petitioner with antisocial personality disorder, he found that Petitioner had mixed personality traits which included antisocial personality traits (E.H. Tr. 91-93, 135-45, 149-51). In addition, Petitioner had previously been diagnosed as a antisocial personality by Dr. Reynolds (1994 Tr. VII, 284). Second, Mr. Rowan testified that Dr. Saint Martin could have shown that Petitioner's deficits "could be controlled, and [he would] never be a problem" or "a danger in the penitentiary to anybody else" (E.H. Tr. 23-24, 30). The evidence, however, does not support this grand statement. Not only is there an absence of evidence that Petitioner ever tried any of the medications that could have potentially treated or even lessened his behaviors, but Dr. Saint Martin admitted that he did not know if the medications would benefit Petitioner. The most Dr. Saint Martin could offer is the statistical response rate. Dr. Saint Martin testified that there is an 80% response rate to medication given for ADD and only a 40% response rate to medication given for impulse control disorder (E.H. Tr. 96-97, 154).

Mr. Rowan further testified that his failure to seek out Dr. Saint Martin or a comparable expert was due to budgetary constraints and job security. He contends that his tight-fisted boss created an atmosphere where expert fees were discouraged or at least

limited. Although he bucked this system in cases before and after Petitioner's, the last time resulting in his being fired, Mr. Rowan testified that he "took the easier path" in Petitioner's case (E.H. Tr. 24-27, 46-51, 73). The evidence shows, however, that Mr. Rowan did not hesitate to request $13,000.00 to compensate Dr. Draper for her services (E.H. Tr. 58; Respondent's Exhibits 33, 36, and 37). In addition, and as previously noted herein, Petitioner had previously been evaluated by other experts who observed Petitioner's mental deficiencies. One can assume that, given their familiarity with Petitioner, any one of them could have been acquired for Petitioner's resentencing proceeding with less funds; however, Mr. Rowan made no attempt to do so. It is difficult to believe that someone as zealous as Mr. Rowan would have simply stopped at Dr. Draper if he felt he needed more, and it is highly unlikely that he would stop bucking the system in the midst of Petitioner's case and after having requested and received $13,000.00 for expert services without any apparent backlash.

The record reflects as well that Dr. Draper was not an afterthought or a fall back position. Mr. Rowan had worked with Dr. Draper before and "gotten wonderful results." He believed that Dr. Draper "would give a compelling developmental story, which would resonate with the jury" (E.H. Tr. 73). In addition, by going with her instead of the mental health experts, Mr. Rowan was able to "soft-shoe past the sentry, so to speak." With Dr. Draper, Mr. Rowan could take the focus off Petitioner's test results (including a prior diagnosis of antisocial personality disorder, among other things), and focus on the life events

that affected his development (E.H. Tr. 43, 53). Given this, and the other circumstances detailed above, the Court finds that Mr. Rowan did not act deficiently in his representation of Petitioner.

In addition to Petitioner's failure to establish deficient performance, the Court finds that Petitioner has also failed to demonstrate prejudice. <u>Strickland</u> requires Petitioner to show that Mr. Rowan's errors and omissions resulted in actual prejudice to him. <u>Id.</u> at 687. In order to make a threshold showing of actual prejudice, Petitioner "must show that there is a reasonable probability that, but for [Mr. Rowan's] unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." <u>Id.</u> at 694. Where, as here, the claim is the omission of mitigating evidence, the proper assessment of actual prejudice includes consideration of *all* of the mitigating and aggravating evidence. This includes not only the aggravating and mitigating evidence presented at trial in light of the omitted mitigation evidence which Petitioner asserts should have been admitted, "but also what the prosecution's response to that evidence would have been." <u>Wilson v. Trammell</u>, 706 F.3d 1286, 1305-06 (10th Cir. 2013) (discussing the application of <u>Wong v. Belmontes</u>, 588 U.S. 15 (2009)).

In its previous denial of Petitioner's ineffectiveness claim on the prejudice prong, this Court outlined in detail both the mitigating and the aggravating evidence presented in Petitioner's resentencing proceeding. While the Tenth Circuit disagreed, on the then existing

record, that Dr. Saint Martin's declaration could not be so easily disposed of, it did not dispute the Court's assessment of the presented evidence, but only the weight afforded Dr. Saint Martin's declaration. As discussed herein, Dr. Saint Martin's declaration was not all that it appeared to be. It is relevant evidence and it is from the perspective of a medical doctor who arguably could have painted the best picture of Petitioner's mental health. However, it is not Petitioner's holy grail. As already discussed herein, it is not new evidence, and it is clear that the introduction of this evidence would have been accompanied by demonstrated limitations and pitfalls.

By presenting only Dr. Draper and Petitioner's difficulties from a developmental perspective, Mr. Rowan avoided the introduction of the following evidence related to Petitioner's mental health: (1) a prior diagnosis of antisocial personality disorder (1994 Tr. VII, 284); (2) Dr. Saint Martin's admission that Petitioner had antisocial traits (E.H. Tr. 91-93, 135-45, 149-51); (3) Dr. Saint Martin's admission that people with ADD are "significantly more likely to develop anti-social personality disorder" (E.H. Tr. 145); (4) evidence that ADD "has a very, very low correlation with criminal activity" (E.H. Tr. 291); (5) a prior schizophrenic disorder diagnosis, which Dr. Saint Martin discounted because he believed it was based on a lie Petitioner told to the evaluator to receive a mental health report favorable to his case (1994 Tr. VII, 232-33, 284; E.H. Tr. 121-22); (6) Dr. Saint Martin's acknowledgment that Petitioner had also lied to him (E.H. Tr. 119-21); (7) evidence that Petitioner tests in the low average to average range on "a very, very, very large number

of tests [for] intellectual functioning and neuropsychological functioning" (E.H. Tr. 114); and (8) evidence that Petitioner has never undergone treatment for his mental conditions and therefore it is unknown if medications could help control his bad behaviors, especially with respect to Dr. Saint Martin's diagnosis of impulse control disorder, where statistically there is only a 40% response rate (E.H. Tr. 96-97, 154). Therefore, evaluating the mitigating and aggravating evidence in its entirety, including the baggage that would have come along with the introduction of Dr. Saint Martin's opinion, the Court cannot find that Petitioner was prejudiced by Mr. Rowan's failure to present the evidence. As the Court previously found,

> This is not a case where no mitigation evidence was presented. In fact, it is a case where all of the circumstances of Petitioner's life were explored and detailed to the jury. Petitioner's life path, with all its disruptions and dysfunctions, was openly displayed. Through an expert witness, family members, a former teacher, and even Petitioner himself, the jury heard evidence which explained how Petitioner, at the young age of 20, ended up robbing a convenience store and facing the death penalty. See Mayes v. Gibson, 210 F.3d 1284, 1288 (10th Cir.2000) (the purpose of mitigation evidence is to individualize the sentencing proceeding; mitigation evidence gives a capital defendant the opportunity to "humanize and explain" his actions).

Littlejohn, 2010 WL 2218230, at *29 (footnote omitted).

For the foregoing reasons, the Court finds that Petitioner's claim of ineffectiveness against Mr. Rowan must be denied. With respect to Petitioner's additional claim of cumulative error, because the Court has concluded that Mr. Rowan was not deficient, the

Court finds no reason to revisit its previous holding. Relief on Petitioner's Grounds Nine and Ten are therefore DENIED. A judgment will enter accordingly.

IT IS SO ORDERED this 30th day of July, 2014.


VICKI MILES-LaGRANGE
CHIEF UNITED STATES DISTRICT JUDGE